HELEN MAZUR, Adm'r of the Estate of Edward A. Mazur, Deceased, Plaintiff-Appellant, v. LUTHERAN GENERAL HOSPITAL *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 85—1701

Opinion filed May 6, 1986.

William J. Burke and Linda A. Leonetti, both of James Thomas Demos & Associates, Ltd., of Chicago, for appellant.

John D. Cassiday and Michael G. Thomas, both of Cassiday, Schade & Gloor, of Chicago, for appellees Lutheran General Hospital and Carl Hill.

Neil K. Quinn, of Pretzel & Stouffer, Chartered, of Chicago (Robert Marc Chemers and Terri R. Olian, of counsel), for other appellees.

JUSTICE HARTMAN delivered the opinion of the court:

Plaintiff appeals from the denial of a motion for a new trial after an adverse jury verdict in a medical malpractice action, raising as issues whether: (1) expert medical testimony was erroneously admitted in violation of Supreme Court Rule 220 (103 Ill. 2d R. 220); (2) expert medical testimony was erroneously excluded as conjectural; and, (3) the circuit court gave the jury improper instructions on proximate cause.

On April 18, 1977, decedent, Edward Mazur, saw defendant Dr.

Alfons Czarkowski, complaining of loss of weight, loss of appetite and a sore throat. After examining and testing decedent, Dr. Czarkowski made a preliminary diagnosis of jaundice and dehydration with suspected liver problems and arranged for decedent to enter defendant Lutheran General Hospital ("Lutheran General") that afternoon.

Dr. Czarkowski, who was leaving town, also made arrangements for defendant Dr. Hubert Gornstein to attend decedent. On admission to the hospital, the on-call medical resident took a complete history from, and gave a physical examination to, decedent. Tests run on decedent established that he was malnourished due to his alcoholism, but was not dehydrated. To treat decedent's malnutrition, food and oral fluids were ordered. Drugs were prescribed to prevent severe alcohol withdrawal and *delirium tremens*. Additional tests were ordered.

Over the next three days, April 19-21, 1977, decedent seemed to improve; however, at 6 a.m. on April 22, 1977, he was found dead in his bathroom. An autopsy performed that day, supervised by Dr. Jonas Valaitis, chairman of the division of pathology at Lutheran General, led the latter to conclude that decedent had died from bronchopneumonia and had also suffered from "much fatty change of the liver."

On December 30, 1977, Helen Mazur, decedent's wife, as administratrix of decedent's estate and individually, filed a complaint against defendants, Lutheran General, Dr. Gornstein, and Dr. Czarkowski in two counts for wrongful death and family expenses. This action eventually proceeded to trial on her fourth amended complaint, on the same theories, but naming Dr. Carl Hill, an additional treating physician, as another defendant.

Numerous and extensive depositions were taken in preparation for trial. Dr. Valaitis was deposed on October 28, 1983. Following that deposition, of his own volition, he performed further pathological tests on certain retained tissue and reported additional findings on November 2, 1983, in an official addendum. In that addendum he added "[f]atty embolism of [the] lungs involving capillaries and pulmonary arteries" as a cause of death in addition to bronchopneumonia. Fatty embolism results from the lodgment of fat globules in the pulmonary capillaries and arteries, interfering with the exchange of oxygen and blood, producing an oxygen deficiency and can be part of the syndrome known as "sudden death" according to Dr. Valaitis, and another expert, Dr. Harry Ruder, an internist who testified on defendants' behalves.

The jury found all defendants not guilty. In her post-trial motion

for new trial, which was denied, and here on appeal, plaintiff raises three primary issues, claiming that: (1) the expert testimony of Dr. William Buckingham, a defense witness, was erroneously allowed to contradict his pretrial deposition testimony in violation of Supreme Court Rule 220; (2) the expert testimony of Dr. Edmund Lewis as to cause of death was erroneously excluded as conjectural; and (3) certain of the instructions were erroneously given.

I

■ Plaintiff urges first that defendants' expert witness, Dr. Buckingham, should have been precluded from testifying in contradiction of his deposition testimony, basing her contention on several provisions of Supreme Court Rule 220 (103 Ill. 2d R. 220):

"(b) Disclosure.

(1) *Expert witness.* Where the testimony of experts is reasonably contemplated, the parties will act in good faith to seasonably:

(i) ascertain the identity of such witness, and

(ii) obtain from them the opinions upon which they may be requested to testify.

*** Failure to make the disclosure required by this rule or to comply with the discovery contemplated herein will result in disqualification of the expert as a witness.

* * *

(c) Discovery.

* * *

(3) A party shall be required to seasonably supplement his answers to interrogatories propounded under this rule as additional information becomes known to the party or his counsel.

* * *

(d) Scope of testimony. To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings through interrogatories, depositions or requests to produce, his direct testimony at trial may not be inconsistent with nor go beyond the fair scope of the facts known or opinions disclosed in such discovery proceedings. However, he shall not be prevented from testifying as to facts or opinions on matters regarding which inquiry was not made in the discovery proceedings."

Prior to Dr. Buckingham's trial testimony for the defense on March 15, 1985, evidence of the presence of fat emboli in decedent's lungs was received at trial on March 11, 1985, through plaintiff's wit-

ness, Dr. Valaitis, who stated that his addendum to his initial pathological report found the following: "Additional studies on this autopsy material revealed, on oil red fat stains, lungs containing fat emboli in the capillaries and pulmonary arteries. Therefore, in addition to bronchopneumonia [as a cause of death], [there was] fat embolism of lungs with the two complicating factors in a sudden death due to a fatty liver in this patient with a clinical history of chronic alcoholism." The record also reveals that on cross-examination, plaintiff's expert, Dr. Edmund Donoghue, agreed that massive pulmonary fat emboli were found in decedent and that such emboli probably would be sufficient to cause death, testimony which was given on March 13, 1985.

Dr. Buckingham's deposition testimony, taken on February 14, 1984, identified "the effects of *** alcohol and undernutrition *** primarily on his liver, although it affected his entire body," as the cause of decedent's death, which could have been complicated by Wernicke's polioencephalitis and/or *delirium tremens*. Dr. Buckingham was unaware of Dr. Valaitis' addendum to the post-mortem when he was deposed. It appears that plaintiff's counsel knew of this finding by Dr. Valaitis, however, having made the statement in the principal brief that "at the time of Dr. Buckingham's deposition the plaintiff recognized the significance of Dr. Buckingham's opinion as to the cause of death being different from that which was expressed [by Dr. Valaitis] in the addendum to the autopsy report." (Brief for appellant at 19.) This statement was discussed in the brief of appellees Lutheran General and Dr. Hill (brief for appellees at 15); however, no response was made thereto in plaintiff's reply brief. When advised of this statement in the brief at oral argument, plaintiff's counsel characterized it as a "mistake." Counsel's statement in appellant's brief nevertheless stands as an indicator that plaintiff was well aware of the posture of her case at the time of the Buckingham deposition. (See *Dora Township v. Indiana Insurance Co.* (1979), 67 Ill. App. 3d 31, 32-33, 384 N.E.2d 595, *aff'd* (1980), 78 Ill. 2d 376; McCormick, Evidence sec. 267, at 643 (2d ed. 1972); E. Cleary & M. Graham, Illinois Evidence sec. 802.9, at 539 (4th ed. 1984).) Rule 220(d) limits an expert's direct testimony at trial to the extent facts are known by him at the time he rendered his opinion in discovery proceedings; however, he is permitted to testify "as to facts or opinions on matters regarding which inquiry was not made in the discovery proceedings." Not only was he unaware of the addendum prepared by Dr. Valaitis containing the pulmonary fat emboli evidence, but no inquiry was made of Dr. Buckingham with respect to this evidence, even on a hypothetical basis at his deposition.

Defense attorneys first sent Dr. Buckingham a copy of the Valaitis addendum on March 4, 1985, two days before the trial started, more than a year after his original deposition. Plaintiff made a motion *in limine* on the morning of and prior to Dr. Buckingham's trial testimony seeking to prohibit him "from testifying to any opinion as to cause of death other than those expressed at his deposition and in particular any opinion that fat emboli may have played a part in Mr. Mazur's death," relying on both Rule 220 and supplemental interrogatories, which she had filed on February 18, 1985, and were never answered by defendants as follows:

"3. State whether Dr. William Buckingham has formed any additional opinions since the date of his discovery deposition, February 14, 1984. If the answer is yes, state (a) each additional opinion, (b) the basis for each additional opinion, and (c) the date on which the substance of each additional opinion became known to you."

The circuit court granted plaintiffs' limiting motion but allowed Dr. Buckingham to be questioned about pulmonary fat emboli in a hypothetical question, over plaintiff's objection. The question was based upon a hypothetical patient who was in all respects similar to decedent and Dr. Buckingham stated in response that in his opinion the hypothetical patient "died from a syndrome of sudden death associated with fatty liver mediated by fat emboli to the lungs from the liver." It is not at all incontestable that this testimony was required to have been deemed inconsistent with his deposition testimony since Dr. Buckingham there testified that death was attributable in part to the effects of alcohol on his liver, which also *"affected his entire body."* (Emphasis added.) That the fat emboli found in his lungs came from his fatty liver condition was not controverted at trial. Nevertheless, we find no error in this procedure by the circuit court for additional reasons.

As noted, the finding of fatty emboli in decedent's lung tissue by Dr. Valaitis was not known to Dr. Buckingham at the time his deposition was taken, but was asserted to have been known by plaintiff's counsel at the time of taking Dr. Buckingham's deposition, counsel having recognized the strategic significance of Dr. Buckingham's opinion as to the cause of decedent's death varying from that of Dr. Valaitis. Plaintiff's counsel admittedly was seeking to develop a strategy in the case based upon the conflict in the expert opinions, a conflict which Dr. Buckingham's answer to the hypothetical question at trial diminished and interfered with plaintiff's advantage to be able to argue this lack of agreement to the jury. No objections were raised by

plaintiff with respect to the facts in evidence upon which the hypothetical question was based, nor could she have done so since she placed those very facts in evidence. Nor did plaintiff object to the question upon grounds that essential facts were omitted or distorted. The key element in Federal Rule of Evidence 703, adopted for use in Illinois by the Supreme Court in *Wilson v. Clark* (1981), 84 Ill. 2d 186, 193, 417 N.E.2d 1322, is whether the information upon which an expert bases his opinion in answering a hypothetical question is of a type that is reliable. Courts ordinarily are loathe to interfere with strategies conceived and implemented by the parties; however, a trial is intended to be a systematized, orderly and efficacious search for truth, rather than a battleground of strategems and wit. (*Krupp v. Chicago Transit Authority* (1956), 8 Ill. 2d 37, 41, 132 N.E.2d 532.) In light of the circumstances here presented, the strategy pursued would have obstructed that search and denied the jury further explanation and understanding of highly technical evidence injected into the case by plaintiff herself. Rule 220 could not have been intended for such obstructive purposes as in the context of the situation presented by this case.

■ Further, and assuming *arguendo*, that the answer to the hypothetical question was "inconsistent with *** the *** opinions disclosed in *** discovery" (103 Ill. 2d R. 220(d)), we are of the opinion that the circuit court properly resolved the problem for other reasons, as the following excerpts from the record reveal. Plaintiff's attorney moved to strike Dr. Buckingham's answer to the hypothetical question, as follows:

"MR. BURKE [Plaintiff's attorney]: Your Honor, I would at this time ask that the testimony of the witness regarding the hypothetical question[,] which was inconsistent with his prior deposition testimony and which was not revealed in interrogatories[,] be stricken and the jury instructed to disregard that testimony.

MR. CASSIDAY [Defendants Lutheran General and Dr. Hill's attorney]: Your Honor, the testimony was based on the trial testimony and on no testimony that wasn't in trial. There was no objection that any of the trial testimony was incorrectly stated.

THE COURT: For the reasons earlier discussed, the motion will be denied."

The circuit court later observed, however, that subsections (c)(3) and (d) of Rule 220 might have been violated by allowing Dr. Buckingham to respond to the hypothetical question and explained:

"But for the fact that there was introduced evidence on the plaintiff's case-in-chief as to the cause of death, being what this doctor has just confirmed, so that it is not a new matter that gets into the record, it's already in the record, I found that compelling in permitting you to proceed under this program *** [;] that evidence not being on the record[,] there is no way I would have permitted the examination of this witness to state an opinion other than what he did on his discovery deposition. You would have been limited under 220 *** [;] the Court felt that since it was in the record by witnesses produced on the plaintiff's case-in-chief as to the cause of death[,] *** it was at best cumulative of what is in the record already."

The record reveals that the court considered striking Dr. Buckingham's answer to the hypothetical question, but accurately surmised that by striking the testimony conceivably potent cross-examination might be denied the plaintiff, and properly allowed that election to be made by her counsel.

Before plaintiff's counsel began his cross-examination, defense counsel approached the bench for an additional side-bar and the following exchange occurred, in part:

"MR. CASSIDAY: *** I am willing to *** withdraw that hypothetical and the answer and I will leave it up to Mr. Burke, but I want the record clear that I am willing to withdraw that testimony, the last question and answer, if Mr. Burke wants me to do so.

MR. BURKE: The only trouble at this point your Honor, is that it is out. His opinion has been stated and I am—

THE COURT: If it's agreed that it be withdrawn[,] it will be withdrawn and the appropriate instruction given.

MR. BURKE: I understand, as the court is fully aware, that instruction even though the best intention [sic], doesn't work, and I think I am kind of prejudiced by the fact right now that he has had the opinion out there. I have to be allowed to cross-examine him on it."

After plaintiff's counsel cross-examined Dr. Buckingham, counsel for defendants Lutheran General and Hill explained that his reason for the offer to withdraw the testimony was his concern that the court might have been persuaded that it had erred in allowing the testimony and he was anxious that any evidence perceived by the court as possible error be remedied in advance of any post-trial motions that would be heard by the same court. The court reiterated its understanding that defendants' counsel was willing to have that testi-

mony withdrawn and the jury instructed to disregard it; however, plaintiff's counsel responded that he would stand on his decision to cross-examine the witness rather than strike the testimony. The court then summarized the record:

> "THE COURT: Well, then, if I can just capsulize it, the state of the record as it now stands is that the plaintiff's motion to strike from this witness's testimony his opinion as to the cause of death for the reasons earlier discussed and to instruct the jury to disregard that has after some consideration by attorney Cassiday on behalf of Lutheran General Hospital and Dr. Hill now been met with an invitation by him to permit that question and response to be withdrawn and the jury instructed to disregard it if Mr. Burke, the attorney for the plaintiff, would agree. Am I correct? Is that the state of the record?

> MR. CASSIDAY: That is correct.

> \* \* \*

> MR. BURKE: Based upon the fact that it was out and I felt I couldn't— I had to \* \* \* [erase] it."

Ordinarily the use of a hypothetical question should not be allowed as a device for circumventing Rule 220. Additionally, defendants earlier were asked to supplement any opinions of Dr. Buckingham, but did not do so. A defense attorney stated that he had no excuse for not supplementing Dr. Buckingham's deposition, but that he had only learned of the proposed answer to the hypothetical question the night before Dr. Buckingham was to be called as a witness. This situation might have been resolved differently if defendants had elicited Dr. Valaitis' testimony and pathological findings, for then plaintiff might have argued that the addendum was deliberately withheld to his prejudice. Here, despite testimony of two of plaintiff's other experts to the effect that decedent's demise was caused by defendants' failure to adequately monitor his blood volume, resulting in dehydration and alcohol withdrawal syndrome, plaintiff injected the fat embolism in the lungs as evidence of the cause of decedent's demise.

■ The circuit court cannot be said to have abused its discretion in allowing the hypothetical question to be answered.[1] Particularly is this apparent when plaintiff's counsel objected to the withdrawal of the question and answer, choosing, instead, to cross-examine upon it.

---

[1]We note, parenthetically, that Rule 705 of the Federal Rules of Evidence, adopted by the supreme court in *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, has altered the necessity of propounding hypothetical questions when the expert witness is asked for an opinion without prior disclosure, unless, as in the case *sub judice*, the court requires otherwise.

Plaintiff's cross-examination, based upon Dr. Buckingham's deposition testimony, and whatever inconsistencies plaintiff's counsel perceived as compared to his trial testimony, was thorough and extended. Now claiming error, plaintiff seeks a new trial because of the evidence which she could have had stricken. In *New York, Chicago & St. Louis R.R. Co. v. Blumenthal* (1895), 160 Ill. 40, 50, 43 N.E. 809, the supreme court, in dealing with an analogous issue, stated:

> "We fail to see how counsel for appellant can now complain, that the evidence was allowed to remain in the case, when they themselves opposed its exclusion and objected to its withdrawal from the consideration of the jury."

(Accord, *Petersen v. General Rug & Carpet Cleaners, Inc.* (1947), 333 Ill. App. 47, 63-64, 77 N.E.2d 58.) Further, refusing the offer to withdraw, plaintiff may also be deemed to have waived this issue. See *Auton v. Logan Landfill, Inc.* (1984), 105 Ill. 2d 537, 543, 475 N.E.2d 817.

## II

■ Plaintiff's second contention is that the circuit court erred in prohibiting her expert Dr. Lewis from testifying concerning the cause of decedent's death. The circuit court, apparently finding Dr. Lewis' testimony conjectural, barred any questions as to the cause of death, but agreed to allow him to answer questions concerning decedent's condition. This was based, in part, upon certain answers given by Dr. Lewis to questions propounded at his pretrial deposition, including the following:

> "Q. [Mr. Weaver, defendants Drs. Gornstein and Czarkowski's attorney] Do you have an opinion, based upon a reasonable degree of certainty, as to the cause of this man's death?
>
> A. [Dr. Lewis] Yes, I preface my comments, however, with this. That I think in a situation where there is virtually no information charted about the patient's medical condition, that the cause of the patient's death has to be a matter of conjecture.
>
> That is, there is absolutely no information written down to go on, and so *** the opinion that I'm going to give you, is an opinion based on my concept of what was going on, without a hell of a lot of information from the chart.
>
> Q. Okay. Let me ask you this question. Could you give us your conjecture as to cause of death?
>
> A. Yes, my conjecture about the cause of death is that this man died a respiratory death, which was associated with his receiving a large amount of drugs known to be respiratory depres-

sants, in a situation where he had abnormal liver function and had lost his kidney function, and complicated by plasma volume depletion, due to dehydration.

\* \* \*

A. Now, I should say there is an alternative possibility.

Q. Before you give us the alternative, would you say that what you have just given us is more likely than the alternative that you are now about to give us?

A. In my opinion, it's more likely.

Q. Because you gave it to us first?

A. Right.

Q. What is the alternative?

A. The alternative is that the man died what people refer to as quote unquote, an electrical death, bioelectrical death.

\* \* \*

Q. You indicated that your first reason, the more probable of the two, was a conjecture.

Would you say that this second reason, the electrical death, was more conjectural than your first opinion?

A. Yes, I think it is more conjectural, because—

Q. That because you don't have data on which to give the opinion?

A. Well, in the absence of data, I think it's less likely that somebody would raise their potassium that high to stop their heart in that period of time. But really, one is only guessing."

The circuit court properly excluded the testimony as conjectural. *Simon v. Lumbermens Mutual Casualty Co.* (1977), 53 Ill. App. 3d 380, 368 N.E.2d 344; *Sommers v. American Economy Insurance Co.* (1972), 8 Ill. App. 3d 450, 289 N.E.2d 712.

### III

■ Plaintiff's final argument is that the circuit court improperly instructed the jury as to proximate cause. The instruction given was defendants' instruction No. 6, the "short form" of Illinois Pattern Jury Instruction, Civil, No. 15.01 (2d ed. 1971), (IPI Civil 2d):

"When I use the expression 'proximate cause,' I mean a cause, which, in natural or probable sequence, produced the injury complained of."

Plaintiff had alternatively offered plaintiff's instruction No. 13, the "long form" of IPI Civil 2d No. 15.01 which adds to the short form quoted above the following:

"It need not be the only cause, nor the last or nearest cause. It

is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury."

In *Curry v. Summer* (1985), 136 Ill. App. 3d 468, 483 N.E.2d 711, the long form was held proper in cases involving multiple defendants and concurring or concerted action. (*Curry v. Summer* (1985), 136 Ill. App. 3d 468, 474-75, 483 N.E.2d 711; accord, *Heitz v. Hogan* (1985), 134 Ill. App. 3d 352, 361-62, 480 N.E.2d 185.) Plaintiff relies heavily upon this holding. The *Curry* court went on to hold, however, that failure to give the long-form instruction was not reversible error as long as the jury was not misled into believing that only one defendant could be the proximate cause. (*Curry v. Summer* (1985), 136 Ill. App. 3d 468, 476, 483 N.E.2d 711.) No such confusion appears here, since plaintiff's given instruction No. 18A (IPI Civil 2d No. 20.01.01) informed the jury that there could be one or more proximate causes of her damages; plaintiff's given instruction No. 9 (IPI Civil 2d No. 21.02.01 modified) advised the jury that it could find that plaintiff had proved that the negligence of none, one, two, or three or all defendants had caused her damages; plaintiff's given instruction No. 15 (IPI Civil 2d No. 41.03) told the jury that it must decide each defendant's case separately; and other given instructions specifically contemplated a verdict against more than one defendant and advised the jury on how it should state such a verdict. Plaintiff's argument does not persuade.

■ Plaintiff also insists that the circuit court should have given her substituted proximate-cause instruction No. 30 (IPI Civil 2d No. 12.05 modified), needed to overcome the pervasive influence which decedent's alcoholism had in the testimony. The authority upon which plaintiff relies, *Lounsbury v. Yorro* (1984), 124 Ill. App. 3d 745, 751-52, 464 N.E.2d 866, does not make mandatory the giving of IPI Civil 2d No. 12.05 when there is evidence of a pre-existing ailment or condition and, in fact, such an instruction was not given by the circuit court there, the decision of which was affirmed. Here, the instructions, taken as a whole, were sufficiently clear so as not to prejudice the parties, mislead the jury or misstate the law. (*Korpalski v. Lyman* (1983), 114 Ill. App. 3d 563, 568, 449 N.E.2d 211.) We find no error.

Upon consideration of the foregoing, there are no bases upon which to alter the rulings of the circuit court or the jury verdict. Accordingly, the circuit court's denial of plaintiff's motion for a new trial must be affirmed.

Affirmed.

STAMOS and SCARIANO, JJ., concur.