RAYMOND EARL LEE, a Minor, by Ray Lee, his Father and Next Friend, Plaintiff-Appellant, v. INGALLS MEMORIAL HOSPITAL *et al.*, Defendants-Appellees.

First District (1st Division)   No. 1—91—0525

Opinion filed October 26, 1992.

Donald V. Young, of Chicago, for appellant.

Laura J. Ginett, Hugh C. Griffin, and Kathryn C. Wyatt, all of Lord, Bissell & Brook, of Chicago, for appellees.

JUSTICE O'CONNOR delivered the opinion of the court:

Plaintiff, Raymond Earl Lee, by his father and next friend, Ray Lee, sought damages from defendant, Ingalls Memorial Hospital, and codefendant, Dr. Jalai Abtahi, for injuries received because of defendants' alleged negligence during Raymond's birth at the hospital on February 27, 1977. At the ensuing trial, a jury returned a verdict against Dr. Abtahi for $3.3 million. The jury also returned a verdict in favor of the hospital. Plaintiff appeals from the jury's verdict in favor of the hospital.

We affirm.

Cynthia Lee, Raymond's mother, testified that she arrived at the hospital at 12:20 a.m. on February 27, 1977. Following her admission, two nurses performed a preliminary examination of her. Mrs. Lee did

not recall being given any medication at this point. Later, Mrs. Lee was transferred to the labor room where she received medication intravenously. Not long after, Dr. Abtahi entered the room and told her to push. After pressing on her stomach, he told her that she had to be put to sleep. Mrs. Lee next saw Dr. Abtahi after she had recovered, and he informed her that he had experienced difficulty in delivering the baby's shoulders and that he had had to "use some instruments." Mrs. Lee stated that Raymond has trouble with his right arm, which he cannot use in a normal manner.

According to plaintiff's expert, Dr. Ronald Lorenzini, Raymond's birth was complicated by a condition known as dystocia, which arises when a baby's shoulders cannot be delivered following the delivery of the infant's head during the course of a normal birth. Lorenzini stated that the medical care and treatment afforded to Mrs. Lee in this case were not within the accepted standard of medical care. Specifically, Lorenzini faulted the hospital's "injudicious" use of Pitocin and Dr. Abtahi's "excess force." Pitocin is an oxytocic drug which causes the uterus to contract forcefully and is used to stimulate labor. Lorenzini noted that, according to the hospital record of Raymond's birth, Pitocin was given to Mrs. Lee intravenously at some time "predelivery." Lorenzini stated that if Pitocin was given pursuant to a verbal order of the doctor, then no deviation from the standard of care occurred. Moreover, Lorenzini admitted that Pitocin has no relationship to the development of dystocia and that there was no indication that the administration of Pitocin to Mrs. Lee prior to Raymond's delivery caused or contributed to the injury at issue. Lorenzini stated the child's injury was due to Abtahi's inappropriate use of forceps and excess force.

Dr. Abtahi testified that he received two telephone calls from the hospital on February 27, 1977, regarding Mrs. Lee's labor. During one of the calls, he ordered Demerol, a painkiller, for Mrs. Lee. According to the nursing progress notes, no oxytocic drugs were administered to Mrs. Lee while she was in the labor room. Abtahi could not recall if he ordered Pitocin for Mrs. Lee. If he did order Pitocin verbally, there would not be a written order for it on Mrs. Lee's chart. The only indication of such a verbal order would be an "X" on the delivery room record, which, in fact, appeared on Mrs. Lee's chart. If, however, Pitocin was given to Mrs. Lee without his order, then a deviation from the accepted standard of care had occurred. During Raymond's delivery, the baby's shoulders became lodged behind Mrs. Lee's pelvis. To facilitate the delivery, Abtahi used forceps and performed maneuvers.

After the child was born, Abtahi noticed that the child's right arm was injured.

Bettie Yale, one of the labor and delivery room nurses who attended Mrs. Lee on the night in question, testified that, after Mrs. Lee's admission to the hospital, Dr. Abtahi was telephoned. At 1 a.m., Dr. Abtahi was called to come to the hospital because Mrs. Lee's labor had progressed. Mrs. Lee was given Demerol intravenously pursuant to the doctor's telephone order. Mrs. Lee was brought into the delivery room at 1:25 a.m. According to Yale, the labor was stimulated with the aid of Pitocin, which was given intravenously in the delivery room. Yale swore that she did not give Mrs. Lee Pitocin without an order from the doctor. During deliveries, Pitocin commonly is ordered verbally because the physician cannot take the time to write out a written order. In contrast, a written order is required if the drug is to be administered in the labor room.

Roseanne Rooney was the other labor and delivery room nurse who attended Mrs. Lee on February 27. Rooney made entries on Mrs. Lee's chart, noting her vital statistics and the medicinal orders received by phone from Dr. Abtahi. These drugs were noted on Mrs. Lee's labor room record and on her "IV fluid sheet." According to Rooney, Dr. Abtahi did not order Pitocin over the phone, and Mrs. Lee did not receive the drug in the labor room because if such an order had been given, Pitocin would have been noted on Mrs. Lee's labor room record, on her medication record and on her IV fluid sheet. Mrs. Lee began receiving medicine intravenously at 1 a.m., and she was taken to the delivery room at 1:25 a.m. According to Mrs. Lee's delivery room record, she was given Pitocin in the delivery room "predelivery" on the verbal order of Dr. Abtahi. Rooney swore that she did not administer Pitocin without the doctor's order. Neither Rooney nor Yale could state positively that she entered the "X" on Mrs. Lee's delivery room record, indicating that Pitocin had been administered.

Mary Sandra Weaver, the hospital's coordinator of nursing policy and procedure, testified that, during 1977, 10 to 12 policies were in effect, one of which was an obstetric and gynecology policy book and one of which was a general nursing policy book. The obstetric and gynecology policy book applied only to nurses working in that specialty area. The general policy book governed the entire nursing department. According to Weaver, verbal and written order policy concerning the drug Pitocin would not be contained in the general nursing policy book because that drug is only administered in the specialty area of obstetrics and gynecology. Weaver identified the general

nursing policy book revised on August 8, 1978. That particular policy made no reference to Pitocin. Weaver attempted to search for the policy manual in effect during the time in question, but could not locate it. Weaver did not know the practice of Pitocin administration in delivery room situations in 1977 because she was not a "labor/delivery" room nurse.

Both defendants' experts testified that the "X" on the delivery room record indicated that Pitocin was administered to Mrs. Lee and that such a procedure comported with the standard of care. Both doctors testified that the administration of Pitocin did not cause or contribute to Raymond's injury.

Following closing arguments, the jury returned the verdicts indicated above. The circuit court denied all post-trial motions, and this appeal followed.

Plaintiff first asserts that circuit court erred by refusing to allow certain rebuttal evidence. Plaintiff contends the hospital, at trial, claimed to be in compliance with applicable written hospital policies, contrary to the position it took during discovery, when it claimed that such policies did not exist. Specifically, plaintiff sought to admit the following interrogatory answer provided by the hospital during discovery:

> "There is no hospital protocol for documentation of verbal orders for the date of this incident. The policy was written in 4/7/76, revised in 5/25/76, and revised in 8/8/78 and therefore it is unclear from the 1978 policy what policy was in effect in 1976 and therefore this policy will not be turned over as it is an irrelevant post-occurrence policy."

The circuit court refused to admit this answer into evidence during rebuttal.

■ Generally, the allowance of rebuttal evidence lies within the discretion of the circuit court, and its ruling on the issue will not be set aside absent an abuse of discretion. (*Danhof v. Richland Township* (1990), 202 Ill. App. 3d 27, 559 N.E.2d 1155, *appeal denied* (1991), 136 Ill. 2d 542, 567 N.E.2d 330.) Here, the hospital claimed it complied with the policies contained in its Obstetrics and Gynecology Policy and Procedure Manual which was in effect in 1977. This was produced to plaintiff during discovery and was referred to by the various witnesses at trial. Mary Sandra Weaver, the hospital's coordinator of policy during the time in question, testified that she was unable to locate any general written policy for verbal orders prior to the one effective August 8, 1978. We have examined the testimony presented and the material produced during discovery and find that circuit court

did not abuse its discretion in this matter because the hospital's position at trial was consistent with the answers given during discovery.

■ Plaintiff further argues that the circuit court erred in admitting the testimony of Mary Sandra Weaver, the hospital's coordinator of nursing policy, because no foundation was laid as to Weaver's opinion regarding the hospital's policies in 1977.

After carefully reviewing Weaver's testimony, we are satisfied that Weaver did not render any opinions regarding compliance with the standard of care nor did she give any opinion as to how a verbal order for Pitocin should be entered on the delivery room chart. In fact, Weaver stated that she did not know how Pitocin was administered in the labor and the delivery room because she was not a "labor/delivery" nurse. Weaver merely testified that the hospital did indeed have policy manuals with regard to the various nursing departments. Weaver, as the hospital's coordinator of nursing policy, was certainly competent to identify which policy manual governed which particular nursing department. No error occurred as a result of Weaver's testimony.

Finally, plaintiff contends that the circuit court, by striking a portion of his expert's testimony, improperly prevented him from establishing the theory of his case.

Prior to trial, Dr. Lorenzini was deposed by the hospital. During the deposition, the following questions and answers were given:

"Q. 'Does Pitocin have any relationship to the development of the shoulder dystocia?'

A. 'No, sir.'

Q. 'Was the Pitocin or the use of Pitocin any part of a mechanism of injury in this case?'

A. 'No, sir.'

Q. 'Doctor, is there any indication that the delivery of Pitocin used prior to delivery caused or contributed to this child's injury?'

A. 'No, sir.'

Q. 'Do you have any criticism of the nursing care or the hospital care afforded to this patient?'

A. 'This patient was given Pitocin. There's no documentation that Pitocin was used in any of the medication order sheets.'

Q. 'I thought we had commented in an earlier point after a lot of discussion about the Pitocin that had no relationship to the injury to the fetus?'

A. 'Correct.'

'So if that's a criticism, it is a criticism that does not relate to the injury in this case?'

Answer: 'Correct.' "

Before the beginning of the trial, the circuit court entered an order, pursuant to Supreme Court Rule 220(d) (134 Ill. 2d R. 220(d)), which stated that no expert would be allowed to "go beyond the testimony that has been disclosed in their depositions." During his testimony at trial, however, Dr. Lorenzini attempted to state that the administration of Pitocin caused Dr. Abtahi to use forceps and apply the excessive force. The hospital objected to this testimony, arguing that Lorenzini's testimony contradicted the opinions he previously had given in his deposition.

Supreme Court Rule 220(d) (134 Ill. 2d R. 220(d)) safeguards against an expert witness from testifying during direct examination in a manner inconsistent with the facts known or the opinions disclosed during discovery. The rule also prevents the expert from going beyond the fair scope of the opinions or facts given at the deposition. (*Baird v. Adeli* (1991), 214 Ill. App. 3d 47, 573 N.E.2d 279, *appeal denied* (1991), 141 Ill. 2d 536, 580 N.E.2d 108; *Bart v. Union Oil Co.* (1989), 185 Ill. App. 3d 64, 540 N.E.2d 770, *appeal denied* (1989), 128 Ill. 2d 661, 548 N.E.2d 1066.) To that end, Rule 220 was promulgated so as to allow litigants the opportunity to discover and rely upon the opinions of the experts retained by their opponents. (134 Ill. 2d R. 220, Committee Comments.) Thus, an expert's testimony is restricted to the opinions expressed in the expert's deposition. (*Zajac v. St. Mary of Nazareth Hospital Center* (1991), 212 Ill. App. 3d 779, 571 N.E.2d 840.) As a result, any opinion expressed by an expert in addition to the opinion expressed in his deposition must be excluded. See *Ramos v. Pyati* (1989), 179 Ill. App. 3d 214, 534 N.E.2d 472.

Plaintiff's counsel, at oral argument, maintained that the hospital, during its deposition, failed to ask Dr. Lorenzini the proper questions regarding the "intervening sequence" between the injury and the administration of the drug and, as a result, should not now be allowed to benefit from that failure. We disagree.

■ Dr. Lorenzini was asked several times, during his deposition, whether Pitocin "caused or contributed to" or was "any part of a mechanism of" Raymond's injury. He consistently responded that it did not. He also agreed that Pitocin had no "relationship" to the injury at issue. Given these responses to the questions, we cannot say that the hospital failed to question Lorenzini adequately. The deposition questions, as noted above, clearly invited Lorenzini to make a causal connection between Pitocin and the excess force used by Dr.

Abtahi. Apparently, Lorenzini did not have that opinion at the time of the deposition. However, at trial, Lorenzini stated that "when Pitocin was administered to this patient, the contractions became very quick, forceful, and promoted the doctor to use the forceps to protect the infant's head with the delivery of the infant as he so stated." This opinion was contrary to the opinion given in the deposition. Accordingly, the circuit court did not err in refusing to allow Lorenzini to testify beyond the scope of his deposition testimony. See *Chicago & Illinois Midland Ry. Co. v. Crystal Lake Industrial Park, Inc.* (1992), 225 Ill. App. 3d 653, 588 N.E.2d 337; *Marshall v. Osborn* (1991), 213 Ill. App. 3d 134, 571 N.E.2d 492; *Stringham v. United Parcel Service, Inc.* (1989), 181 Ill. App. 3d 312, 536 N.E.2d 1292, *appeal dismissed* (1989), 127 Ill. 2d 642, 541 N.E.2d 1115.

For the foregoing reasons, the judgment of the circuit court must be affirmed.

Affirmed.

BUCKLEY, P.J., and CAMPBELL, J., concur.