Roselyn and Dorvin GREEN, Appellants,

v.

Sheldon FLEISHMAN, D.P.M., Upjohn
Healthcare Services, Inc., and
Caremark, Inc., Respondents.

No. WD 48233.

Missouri Court of Appeals,
Western District.

June 21, 1994.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Aug. 2, 1994.

Application to Transfer Denied
Sept. 20, 1994.

Robert D. Kingsland, Thomas R. Davis, Dempsey & Kingsland, Kansas City, for appellants.

G. Keith Phoenix, Carolyn L. Trokey, Sandberg, Phoenix & von Gontard, St. Louis, for respondent-Caremark, Inc.

John W. Cowden, Mary C. O'Connell, Baker, Sterchi & Cowden, Kansas City, for respondent-Upjohn Healthcare Services.

Steven G. Emerson, Melody L. Nashan, Watson, Ess, Marshall & Enggas, Kansas City, for respondent Sheldon Fleishman, D.P.M.

Before LOWENSTEIN, P.J., and BERREY and SPINDEN, JJ.

LOWENSTEIN, Presiding Judge.

Roselyn Green and her husband, Dorvin Green, appeal from an order of the trial court granting a directed verdict in a medical negligence case, on behalf of defendants Sheldon Fleishman, D.P.M., Upjohn Healthcare Services, Inc., and Caremark, Inc. The Greens contend the trial court first erred by striking the testimony of their only expert witness on the issue of causation and then granting a directed verdict.

The core issue on appeal is the court's striking of plaintiffs' expert's trial testimony, which opined medical negligence by the defendants, which came without explanation over one year following the expert's deposition where, when asked the same question, he reached no opinion as to negligent treatment or care.

In April, 1988, Roselyn Green was hospitalized for a foot infection at the Medical Center of Independence, where her treatment was managed by Steven Gialde, D.O. and respondent, Dr. Fleishman, a podiatrist, who acted as a consultant. As part of her treatment, Mrs. Green was given periodic dosages of gentamicin, an antibiotic, the use of which may result in possible toxic side effects. During her hospitalization, Mrs. Green was monitored to ensure that the levels of the drug in her blood were safe.

After eleven days of hospitalization, Mrs. Green continued the intravenous gentamicin therapy at home under the supervision of home health care providers, Upjohn Healthcare Services, Inc. and Caremark Inc. The defendant, Caremark, acted as the pharmacy and compounded the medication; the defendant, Upjohn's role as home healthcare agency, was to visit the home 3 days per week and, as relevant here, help with out-patient administration of medication. Despite the fact that Mrs. Green was receiving gentamicin at the same dosage and frequency as she received at the hospital, Gialde did not order out-patient monitoring to ensure that the quantity of the drug in her system did not exceed safe levels. As stated in the previous paragraph, gentamicin is a powerful drug which may accumulate in the blood with toxic effects, which then outweigh its therapeutic effect.

On May 10, 1988, after seventeen days of unmonitored home gentamicin therapy, Mrs. Green suffered a spell of dizziness and a loss of balance. These problems persisted and the Greens filed this petition alleging medical negligence for Mrs. Green's permanent dizziness and disequilibrium, loss of consortium, and sought damages from Dr. Fleishman, Dr. Gialde, Upjohn Healthcare Services, Inc., and Caremark, Inc. The basic theory of the lawsuit was Mrs. Green should have been monitored for toxic side effects of gentamicin following her hospitalization and that all the defendants owed her a duty to monitor. Dr. Gialde subsequently settled with the Greens for $425,000.00.

Dr. Larry Rumans, the Greens' medical expert on the issue of causation, was deposed prior to trial. During his deposition, Dr. Rumans was asked numerous questions about the dosages of gentamicin and the relationship of the drug to Mrs. Green's condition:

Q. [DEFENSE COUNSEL]: And, in fact, sir, are you able to point to anything in the medical records that suggests that Mrs. Green's blood levels of this medication exceeded the maximum therapeutic level?

A. [DR. RUMANS]: Not during her hospitalization.

Q. Are you able to point to anything which would suggest that if those blood

levels were on the low side, given the certain dosage of Gentamicin during hospitalization, that they would have been expected to exceed therapeutic levels during out-patient therapy?

A. Well, the whole point is, Mr. Emerson, that we have no data as to what occurred as an outpatient, and so it is all speculation.

Q. That really is my point, I guess. You are not rendering an opinion, are you, that Mrs. Green's imbalance problems resulted from concentrations of Gentamicin in her blood that exceeded maximum therapeutic levels, are you?

A. Well, you see that is just it. We don't know.

Q. Well, that is my question, you are not suggesting that, are you?

A. I am not necessarily suggesting it, but I am saying that it could have happened.

Q. Okay. My question is whether or not you hold *an opinion within a reasonable degree of medical certainty as to whether or not Mrs. Green's blood levels of Gentamicin exceeded the maximum therapeutic or the allowable therapeutic doses while she was an outpatient?*

A. *I have no opinion.*

Q. Okay. My next question is whether you hold an opinion within a reasonable degree of medical certainty as to whether the *ototoxic effects,* which you believe Mrs. Green suffered, *resulted from excessive blood levels of Gentamicin?*

A. I believe that the ototoxicity that was experienced occurred as a result of excessive aminoglycosides, accumulation and concentration at the site where toxicity occurred, and that *may have been related to excessive blood levels.*

Q. Do you have *any objective evidence* whatsoever to support your speculation that there may have been excessive levels of Gentamicin?

A. Well, again, I have to go back. There is *no data,* Mr. Emerson.

Q. Okay.

A. So that *my speculation it occurred is just as good as anyone's speculation that it didn't occur.*

Q. *And you wouldn't hold out that speculation as being an opinion with a reasonable degree of medical certainty,* would you?

A. *No,* sir. (Emphasis added).

At trial, approximately fourteen months later, Dr. Rumans was asked whether Mrs. Green had toxic levels of gentamicin in her system:

Q. Given the data that you have, all the data with regard to Roselyn Green's tolerance of the drug in the hospital setting and the fact that no laboratory monitoring was done during the 17–day period and your testimony that Gentamicin levels increase in the body with time and with additional dosages, does that data provide you with an inferential basis which allows you to determine, within a reasonable degree of medical certainty, as to whether the levels of Gentamicin went into the toxic range during that 17–day period?

A. I believe that it's likely that the levels did increase to a toxic range.

After the Greens had presented their evidence on the issue of liability, the defendants moved to strike Dr. Rumans' trial testimony on the grounds that it differed from his deposition testimony and constituted an unfair surprise. The motion was granted by the trial court, which ordered that "the testimony of Larry Rumans, M.D. relating to whether the plaintiff's blood levels of gentamicin exceeded the maximum therapeutic or allowable levels be stricken." All the defendants then moved for a directed verdict which was granted.

On appeal, the Greens claim that the trial court erred by striking Dr. Rumans' trial testimony relating to excessive blood levels of gentamicin and by directing a verdict in favor of the defendants.

 When an expert witness has been deposed and later changes that opinion before trial or bases that opinion on new or different facts from those disclosed in the deposition, "it is the duty of the party intending to use the expert witness to disclose that new information to his adversary, thereby updating the responses made in the deposi-

tion." *Gassen v. Woy,* 785 S.W.2d 601, 604 (Mo.App.1990). The source for sanctions is within Rule 56.01(b)(4) which covers discovery of opinions of experts, and in (e)(2) to *seasonably amend responses when appropriate. Id.* at 603. A trial court is vested with broad discretion as to its choice of a course of action during trial when evidence has not been disclosed in response to appropriate discovery, and in the sound exercise of its discretion the trial court may reject such evidence or impose other appropriate sanctions. *Id.* at 604.

The *Gassen* suit was a medical malpractice case where an expert for the defendant who had not seen the critical X-rays prior to deposition, was called to testify at trial after having examined this evidence. The plaintiff correctly claimed surprise, but was given the opportunity by the court to interview the expert prior to the expert taking the stand. The plaintiff rejected this relief. The court then allowed the witness to testify, and this court held that ruling was not an abuse saying, "The very nature of the discretion vested in the trial court recognizes that each case must be determined on its own peculiar facts which bear on the question of whether that discretion has been abused." *Id.*

The case of *State Ex Rel. State Highway. Com. v. Pfitzinger,* 569 S.W.2d 335 (Mo.App. 1978) points out the trial court's latitude in this area, and how the harsh sanctions of striking an expert's testimony may be upheld. The real estate expert for the condemnor had by deposition in 1976 relied on a method of valuation that had been disallowed by the Supreme Court in 1974. *Id.* at 336. Two days prior to trial, the expert reworded an opinion on value using an altogether different, but judicially sanctioned method, "comparable sales," and the trial court did not permit this evidence. The Eastern District, relying on Rule 56.01(b)(4)(b) concluded the landowner was entitled to discover the opinion, and under Rule 61.01(d)(1), the trial judge was justified in not allowing an opinion brought in at the last minute, "based on an entirely different method of appraisal...." *Id.* at 336.

Case law from other jurisdictions also deems it appropriate to exclude expert testimony in circumstances similar to those in the case at bar. In *Bart v. Union Oil Co. of California,* 185 Ill.App.3d 64, 132 Ill.Dec. 848, 540 N.E.2d 770 (1989), app. denied 128 Ill.2d 661, 139 Ill.Dec. 510, 548 N.E.2d 1066 (1989) a woman filed suit to recover damages for her husband's death stemming from two explosions in an oil refinery. In his deposition, the plaintiff's expert witness stated that he could not determine within a reasonable degree of medical certainty whether the decedent had experienced any conscious pain and suffering. Then, at trial, the witness testified that the decedent may have survived the first explosion and suffered pain prior to his death. However, he also testified that it was equally probable that the decedent may not have sustained injury prior to the second explosion. The Illinois Court of Appeals determined that the witness' trial testimony was improperly admitted because it was inconsistent with his deposition testimony.[1] In another Illinois decision, the court in *Mazur v. Lutheran General Hosp.,* 143 Ill.App.3d 528, 97 Ill.Dec. 580, 586–87, 493 N.E.2d 62, 68–69 (1986), the court did not allow a medical expert to testify on causation where in his deposition answers he said he could not reach a conclusion because "... there is virtually no information charted about the patient's medical condition, that the cause ... has to be a matter of conjecture." *See also Lee v. Ingalls Memorial Hosp.,* 238 Ill. App.3d 154, 179 Ill.Dec. 328, 606 N.E.2d 160 (1992).

In the case at bar, this court is unable to conclude that the trial court abused its discretion by striking Dr. Rumans' trial testimony. On review, this court does not sit as a second trial judge on whether the same sanctions would have been imposed. The sole task is to determine whether the trial judge could have reasonably concluded as he did. Under the totality of the circumstances in this case, this court is not prepared to proclaim an abuse of discretion. *Hurlock v. Park Lane Medical Center, Inc.,* 709 S.W.2d

1. The holding in *Bart* relies upon an Illinois Supreme Court Rule which provides that an expert witness' trial testimony may not be inconsistent with the opinions disclosed in any previous deposition testimony. This rule is functionally equivalent to the rule of *Gassen v. Woy,* 785 S.W.2d 601 (Mo.App.1990).

872, 879 (Mo.App.1985). In this case, there was no new fact introduced which would have altered the deposition opinion—there was simply a 180 degree change from no opinion to one of negligence.

■ Judicial discretion is abused when the trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration; if reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. *Anglim v. Missouri P.R. Co.*, 832 S.W.2d 298, 303 (Mo. banc 1992) cert. denied — U.S. —, 113 S.Ct. 831, 121 L.Ed.2d 701 (1992); *Meeker v. Shelter Mutual Ins. Co.*, 766 S.W.2d 733, 740 (Mo.App. 1989). In the case at bar, the propriety of the trial court's decision, though harsh, is within the bounds of reasonable debate; accordingly, the trial court did not abuse its discretion.

■ With Dr. Rumans' testimony stricken from the record, the Greens failed to make a submissible case that Mrs. Green's injuries were the result of the defendants' failure to monitor her blood level of gentamicin. Because the record is left devoid of expert testimony establishing that Mrs. Green had excessive levels of gentamicin in her system, the Greens failed to prove that monitoring would have alerted the defendants to a potential toxicity problem so that they could have averted the onset of her disequilibrium condition. *Thomas v. Myers*, 655 S.W.2d 695, 699 (Mo.App.1983).

■ In order to make a submissible case in a medical malpractice action, the plaintiff must establish a causal connection between the act or omission of the defendant and the injury which the plaintiff received. *Engelbert v. Flanders*, 670 S.W.2d 19, 22 (Mo.App. 1984). The Greens failed to do this in the case at bar. Even reviewed under the heightened scrutiny in reviewing the granting of a directed verdict, *Baker v. Gordon*, 759 S.W.2d 87, 91 (Mo.App.1988), the trial court did not err in granting a directed verdict in favor of the defendants.

In their final point, the Greens claim the trial court erred by granting a directed verdict because they Greens had made a submissible case of medical malpractice against Dr. Fleishman on the grounds that he had negligently concurred in the *initial prescription* of gentamicin even though less toxic alternatives were available.

It was incumbent on the plaintiffs to prove by expert testimony that Dr. Fleishman's conduct did not conform to the standards of his profession. *Hurlock*, 709 S.W.2d at 883. Because there was no expert testimony that Dr. Fleishman's concurrence in the prescription of gentamicin failed to meet the required standard of care, the Greens did not make a submissible case on this issue. *Kinser v. Elkadi*, 674 S.W.2d 226, 229–230 (Mo.App. 1984). The point is denied.

The judgment of the trial court is affirmed.

All concur.