**Rosemary BRAY, Plaintiff/Appellant,**

v.

**BI-STATE DEVELOPMENT CORP., Defendant/Respondent.**

No. 69317.

Missouri Court of Appeals, Eastern District, Division Two.

April 22, 1997.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 14, 1997 .

Application to Transfer Denied Aug. 19, 1997.

94

Leonard P. Cervantes, Mario G. Silva, Frank Carretero, Cervantes & Associates, St. Louis, for plaintiff/appellant.

Robbye Hill Toft, St. Louis, for defendant/respondent.

CRANE, Presiding Judge.

Plaintiff fell and broke her shoulder, arm, and kneecap while stepping off of a curb in a parking garage. She filed a personal injury action against the garage operator which was submitted on the theory that the garage operator was negligent in failing to adequately light or warn in the curb area. The jury returned a verdict in favor of the garage operator. Plaintiff appeals, claiming error in the admission of a computer-generated chart and the exclusion of light reading testimony from her expert witness on rebuttal. She also asserts plain error in closing argument. We affirm.

On the morning of May 28, 1990, plaintiff, Rosemary Bray, was walking to her car in the Gateway Arch Parking Garage on Washington Avenue. The garage was operated by defendant Bi–State Development Corp. Plaintiff was walking on an elevated area described as a "pedestrian refuge area" which was a step higher than the parking area surface. Plaintiff saw a yellow line which she thought designated a parking space, not a curb. While continuing to walk in the same direction, plaintiff came to the point where the refuge area dropped down to the parking surface, lost her balance, and fell. At the time she fell, every other light was off in the parking garage, including the light above where she fell. She broke her shoulder, arm and kneecap in the fall.

At the time of this accident, it was garage policy that every other high sodium light be turned off during daylight hours. The circuits for the garage lights had been designed so that the operator could turn off every other light in this pattern. In the garage, curbs were painted optic yellow and parking spaces were marked with white lines.

On April 12, 1993, plaintiff filed her fifth amended petition against defendant alleging that it was negligent in not lighting the drop off or marking it with a yellow line. The case was submitted to the jury on the theory that defendant was negligent in failing to adequately light or warn of the drop off or not placing a guard rail around it. The jury returned a verdict in defendant's favor, finding plaintiff 100% at fault.

For her first point on appeal, plaintiff contends that the trial court erred in admitting defendant's Exhibit I, a computer-generated chart which graphically depicted in color light intensity levels in the area of the garage where plaintiff fell, and in allowing defen-

dant's expert witness, Mel Millenbruck, to testify to the chart. She asserts that defendant failed to lay a proper foundation for the admission of Exhibit I.

During the trial, defendant called Mel Millenbruck as an expert witness. Millenbruck is a civil engineer who worked for WVP Corporation, a consulting engineering firm. While Millenbruck was assistant project manager for WVP, he worked on the design of defendant's garage. The design included the garage lighting.

Before Millenbruck testified, plaintiff's counsel conducted a voir dire examination outside the hearing of the jury with respect to Exhibit I, which had been produced to plaintiff prior to trial. After voir dire, the trial court overruled plaintiff's objection to the admission of Exhibit I on the ground that there was insufficient foundation of the validity of the software. After Millenbruck testified to the foundation for Exhibit I before the jury, the trial court admitted Exhibit I into evidence over plaintiff's renewed objection that there was no foundation as to the validity of the program.

Millenbruck testified that Exhibit I was a color computer plot which graphically depicted the intensity of the light levels on the garage floor where plaintiff fell, as predicted by the design software for a situation in which the alternating lights are off. Each color represented a range of foot candles of light on the floor's surface. Millenbruck supervised the preparation of Exhibit I. As an engineer he had the training to make the calculations represented by Exhibit I manually, however, it was not practical to do so because it was a very complex geometric calculation which would have to be repeated for every point resulting in a "tremendous amount of hand calculations."

Ward, Rafferty and Jacobs, lighting manufacturers' representatives, who not only sell to contractors, but also assist engineers with lighting design, produced Exhibit I using a software program created by Lighting Analysts, Inc. Ward, Rafferty and Jacobs generally uses Lighting Analysts, Inc. computer software. As an engineer Millenbruck used and relied on this type of software to make lighting decisions. In doing lighting projects, his engineering firm relies on the manufacturer's representative to produce a computer printout from their software.

Lighting Analysts, Inc.'s software program has photometric data in it which allows it to accurately calculate foot candles based on general parameters and specific data that is put into the program. That lighting software predicts the light level on any given horizontal surface based on the spacing of the lights, the mounting height, the wattage of the bulb, the source, and the nature of the bulb.

Millenbruck provided and had personal knowledge of the data fed into the program, which was based on the bulbs, fixtures and wiring actually in place at the garage on the day plaintiff fell. The data included the mounting height of the luminaries, the spacing in both directions of the luminaries, the wattage of the luminaries, the type of luminary, and the distribution of the lens.

Millenbruck used maintenance factors to account for the presence of dirt and the age of the bulbs and lenses. In accord with standard practice to account for maintenance and depreciation of bulb output, Exhibit I was produced with a maintenance factor of .8 for the high pressure sodium lights and .6 for the florescent lights to account for maintenance and depreciation of bulb output. In preparing the lighting information to be given to the computer, Millenbruck did not allow for the existence of sunlight. Thus, his results showed light levels less than actually present because plaintiff fell in the daytime and the garage did admit some natural light. To verify the computer results, Millenbruck also took actual light measurements in the garage and his readings generally conformed with the computer printout.

Millenbruck testified that Exhibit I showed that the lighting where Bray fell was three to six foot candles. He testified that in his opinion, three to six foot candles provided sufficient lighting for a person to be able to see a curb.

Plaintiff's trial objection to Exhibit I was that there was no adequate foundation for the validity of the software. On appeal she asserts the foundation was inadequate because Millenbruck did not prepare the com-

puter program and did not feed the data into the computer. She contends that the computer program and the results computed from the data were therefore hearsay. She also argues that there was no evidence that the computer program used to prepare Exhibit I was accurate or reliable and that there was no evidence that the lighting levels shown in Exhibit I were substantially similar to the actual lighting levels at the parking garage at the time of the occurrence.

■ An objection at trial cannot be expanded to raise new issues on appeal. *Egelhoff v. Holt*, 875 S.W.2d 543, 549 (Mo. banc 1994). "[A]llegations of error not presented to or expressly decided by the trial court shall not be considered in any civil appeal from a jury tried case" Rule 84.13(a). Because plaintiff did not object to Exhibit I on these additional grounds at trial, she waived any error in the admission of Exhibit I on these grounds. *Koedding v. Kirkwood Contractors, Inc.*, 851 S.W.2d 122, 125 (Mo.App. 1993). Plaintiff first raised these grounds in her motion for new trial. An objection presented for the first time in a motion for new trial is not timely. *Id.*

■ Exhibit I was produced for litigation with a computer and graphically depicts the result of computations made with a computer. An adequate foundation includes proper authentication of such computer-generated evidence. The function of computer programs like the program used in this case " 'is to perform rapidly and accurately an extensive series of computations not readily accomplished without use of a computer.' " *Commercial Union v. Boston Edison*, 412 Mass. 545, 591 N.E.2d 165, 168 (1992), quoting *Schaeffer v. General Motors Corp.*, 372 Mass. 171, 360 N.E.2d 1062 (1977). Just as experts may base their testimony on calculations performed by hand, they may perform the same calculations using a computer. *Commercial Union*, 591 N.E.2d at 168. Admissibility of computer simulations is governed by the standard applicable to results of experiments. *Richardson v. State Hwy. &*

*Transp. Com'n*, 863 S.W.2d 876, 881–82 (Mo. banc 1993), recognizing *Schaeffer*, 360 N.E.2d at 1067 and *Deffinbaugh v. Ohio Turnpike Comm.*, 67 Ohio App.3d 692, 588 N.E.2d 189, 193–94 (1990).

■ Whether a proper foundation has been established is primarily a question addressed to the sound discretion of the trial court. *Rust & Martin, Inc. v. Ashby*, 671 S.W.2d 4, 8 (Mo.App.1984). Missouri courts have not laid out specific foundational requirements for computer-generated evidence of this nature.[1] We, therefore, survey cases from other jurisdictions to see what general principles have developed and how these tie in with existing Missouri law.

We begin with *Commercial Union* in which the Massachusetts Supreme Court enunciated the following guidelines to establish a foundation to authenticate computer-generated evidence. The court conditioned admissibility on a sufficient showing that:

(1) The computer is functioning properly;

(2) The input and underlying equations are sufficiently complete and accurate (and disclosed to the opposing party, so that they may challenge them);

(3) The program is generally accepted by the appropriate community of scientists.

*Commercial Union*, 591 N.E.2d at 168. Two other states have expressly used these guidelines. *Kudlacek v. Fiat S.p.A*, 244 Neb. 822, 509 N.W.2d 603, 617 (1994); *State v. Clark*, 101 Ohio App.3d 389, 655 N.E.2d 795, 812 (1995). Such a foundation overcomes a hearsay objection. *Commercial Union*, 591 N.E.2d at 168.

Courts have not required the first requirement of the *Commercial Union* guideline, that the computer be functioning properly, to be affirmatively shown in the absence of any challenge thereto. In *Clark*, the court found the absence of evidence that the computer was functioning properly insignificant in view of the fact that the opposing party did not voir dire the expert on this issue. *Clark*, 655

---

1. On the other hand, the foundation necessary to authenticate computer-stored or computer-generated business records is well-established. *See Medicine Shoppe International, Inc. v. Mehra*, 882 S.W.2d 709, 713 (Mo.App.1994); *Missouri Valley Walnut Co. v. Snider*, 569 S.W.2d 324, 328 (Mo. App.1978).

N.E.2d at 813. The issue of computer functioning was not further discussed in *Commercial Union* or *Kudlacek*. Likewise, in cases dealing with the admissibility of computer-stored or computer-generated business records, courts do not require the computer's operating condition to be established in the absence of challenge. *See Missouri Valley Walnut Co.*, 569 S.W.2d at 328; *United States v. Russo*, 480 F.2d 1228, 1239 (6th Cir.1973); *United States v. Vela*, 673 F.2d 86, 90 (5th Cir.1982); 2 McCORMICK ON EVIDENCE § 294, at 284 (4th ed.1992).

■ With respect to the second *Commercial Union* guideline, cases generally require that the accuracy of the input be established. *See e.g. Kudlacek*, 509 N.W.2d at 617; *Clark*, 655 N.E.2d at 813; *Deffinbaugh*, 588 N.E.2d at 194. However, the relevant technical or scientific community's use of or reliance on such software has been held sufficient to establish the accuracy of the software. *Clark*, 655 N.E.2d at 813; *Lowe v. Norfolk and Western Ry. Co.*, 124 Ill.App.3d 80, 79 Ill.Dec. 238, 262, 463 N.E.2d 792, 816 (1984). This is also sufficient in Missouri. *State v. Smith*, 656 S.W.2d 297, 298 (Mo.App.1983). In *Smith*, a chemist used a computer disc containing the known chemical molecular pattern makeup of chemicals to identify the molecular pattern and chemical content of tablets sold by defendant. The court held that the chemist's testimony that this was recognized as a reliable method of testing to identify chemical content in his field established a sufficient foundation and it was not necessary to show that the chemist had programmed the computer or that the programmed information on the disc was accurate. *Id.*

■ The second guideline contains a parenthetical requirement of pretrial disclosure. Pretrial disclosure gives the opposing party an adequate opportunity to raise objections by motion in limine and to prepare for cross-examination and rebuttal. *Richardson*, 863 S.W.2d at 882; *Clark*, 655 N.E.2d at 813; *Deffinbaugh*, 588 N.E.2d at 194. Pretrial disclosure also reduces the need for more exacting foundational requirements. *See*

JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S EVIDENCE § 901(b)(9)[02] at 901–134 (Vol. 5 1996). Exclusion of evidence for lack of pretrial disclosure is within the trial court's discretion. *Richardson*, 863 S.W.2d at 882. *See also United States v. Bastanipour*, 697 F.2d 170, 177 (7th Cir. 1982); *Perma Research and Development v. Singer Co.*, 542 F.2d 111, 115 (2nd Cir.1976).

■ The third *Commercial Union* guideline, general acceptance, derives from the *Frye*[2] standard for admission of testimony based on scientific principles and the results of scientific tests. *Commercial Union*, 591 N.E.2d at 169. Missouri has adopted the *Frye* rule for determining the admissibility of new scientific techniques, *Alsbach v. Bader*, 700 S.W.2d 823, 828 (Mo. banc 1985), and continues to follow it. *See Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 860 (Mo. banc 1993); *Schumann v. Mo. Highway & Transp. Com'n*, 912 S.W.2d 548, 554 n. 8 (Mo.App.1995).

In *Commercial Union*, 591 N.E.2d at 169, general acceptance was specifically challenged by motion in limine and detailed evidence was offered to support a finding of general acceptance. On the other hand, in *Kudlacek* and *Clark*, the courts found general acceptance established by showing reliance by experts in the field. *Kudlacek*, 509 N.W.2d at 617; *Clark*, 655 N.E.2d at 813. In *Kudlacek*, the opinion does not indicate the basis for the foundational objection, but the court held that the accident reconstruction expert's testimony that the computer program was used regularly by members of the largest failure analysis firm in the world and was generally relied on by experts in the field was sufficient to satisfy the general acceptance test. 509 N.W.2d at 617. In *Clark*, appellant raised a concern over whether Auto–CAD software which provides crime scene reconstruction through the use of computer-generated simulations or computer-assisted drafting had gained general acceptance. 655 N.E.2d at 813. The court held that the use of such software in other cases and the witness's testimony that another individual had used the same software and had

2. *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923).

testified at a trial was sufficient to admit the computer-generated evidence. *Id.*

The reasonable reliance which these courts hold sufficient to establish general acceptance parallels § 490.065.3 RSMo 1994 which allows an expert to base an opinion on facts and data "of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable." *See State ex rel. MHTC v. Matula,* 910 S.W.2d 355, 358–59 (Mo.App.1995); *Schreibman v. Zanetti,* 909 S.W.2d 692, 698 (Mo.App.1995).

Other state courts have considered the sufficiency of a foundation to authenticate computer-generated evidence using similar criteria. In *Deffinbaugh,* the Ohio Court of Appeals found a sufficient foundation where the testifying expert testified 1) to the name of the program he used, 2) that the program offered an accurate depiction of the motion of the vehicle, and 3) that he used known facts and a reliable estimate of speed to generate the simulation and where the use of the computer simulation was disclosed pretrial. 588 N.E.2d. at 194. In *People v. McHugh,* 124 Misc.2d 559, 476 N.Y.S.2d 721, 723 (Sup.1984),the court ruled that a computer reenactment of a car crash may be admitted into evidence if it is relevant to a possible defense, fairly and accurately reflects the oral testimony, and aids the jury's understanding of the issue.

Finally, we note that Rule 901(b)(9), FED. R.EVID., for authentication of a process, includes computer-generated evidence:

(a) General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

(b) Illustrations. By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming to the requirements of this rule.

. . . .

(9) *Process or system.* Evidence describing a process or system used to produce a result and showing that the process or system produces an accurate result.

A court may take judicial notice of the accuracy of the process or system. FED. R. EVID. 901 advisory committee's note.

The above cases and authority demonstrate that, while *Commercial Union* provides a helpful starting point to analyze questions of sufficiency of foundation, its three guidelines standing alone do not precisely reflect what courts in fact require or consider sufficient to establish a sufficient foundation. Few jurisdictions have attempted to enunciate a formula or fixed set of guidelines to govern the establishment of a foundation for computer-generated evidence other than business records. However, there is a developing consensus, as shown by the cases and authorities cited herein, which agrees on how the accuracy of computer-generated evidence can be established and gives a trial court sufficient parameters to exercise its discretion in this area without the need for a precise formula.

██ We therefore turn to the question of whether, in this case, the trial court abused its discretion in overruling plaintiff's objection that an insufficient foundation was laid for the validity of the software. We conclude it did not. Millenbruck testified that the computer program, the Lighting Analysts, Inc. software, contained data that allowed it to produce a printout which accurately predicted light levels based on the information fed into the program. Millenbruck testified that engineers rely on the program to make lighting decisions and that the lighting manufacturer's representative generally uses that particular software to produce printouts of light intensity levels. Millenbruck was thoroughly familiar with what the software did with the data supplied to it and knew how to manually calculate the same results. He verified the results with actual light readings. Exhibit I was produced to plaintiff prior to trial. Millenbruck's testimony that the Lighting Analysts, Inc. software was a program which produced accurate results and was used generally by the lighting manufacturer's representative and relied on by engineers to design lighting and make lighting decisions was sufficient under these circum-

stances. *See Smith,* 656 S.W.2d at 298; *see also Kudlacek,* 509 N.W.2d at 603.

■ Although they were not raised at trial, we have examined plaintiff's other objections to Exhibit I and find no plain error. Plaintiff argues that a proper foundation requires proof that the hardware was tested for defects and that the capacity, capability and reliability of the equipment be checked. Plaintiff did not challenge the functioning of the hardware at trial or inquire about it on her voir dire of Millenbruck. Under these circumstances proper functioning need not be affirmatively shown. *See Clark,* 655 N.E.2d at 813.

■ Plaintiff next argues that Millenbruck did not personally run the program or feed the data into the computer. There is no general requirement that a testifying expert physically do this. WEINSTEIN, *supra,* 901–136. In this case Millenbruck supervised the process and supplied the data to be entered. He testified he generally relied on the manufacturer's representative to actually run the program.

■ Plaintiff's last argument, that there was insufficient evidence that the lighting levels shown on the chart were substantially similar to the lighting levels on the day of the accident, is not supported by the record. Millenbruck testified how the lighting data duplicated lighting conditions on the day of the accident. He fully informed the jury how the variables—dirt, age, and sunlight were accounted for and was thoroughly cross-examined with respect to these variables. He testified the results were more conservative than the actual lighting conditions because he did not make any allowance for sunlight. "Variances in conditions which are more detrimental to the proponent of the test than those which existed in the original will not bar admission." *Lawson v. Schumacher & Blum Chevrolet, Inc.,* 687 S.W.2d 947, 954 (Mo.App.1985).

The trial court did not err in admitting Exhibit I over the objection to foundation based on a challenge to the validity of the software. Point one is denied.

■ For her second point plaintiff contends that the trial court erred in refusing to admit on rebuttal the testimony of her expert, William Michael McNutt, that he had taken light readings in the parking garage in the area where the plaintiff fell and that the light readings either measured no reading (NR) or a measurable level of one foot candle. She argues the evidence was relevant to rebut Bi–State's evidence that the lighting in the area in question was three to six foot candles.

McNutt, a civil engineer, was retained in early 1994 and was deposed on August 5, 1994. At his deposition McNutt testified that he did not take any readings of lumens or foot candles in the garage areas he considered significant. After he was deposed, McNutt took light level readings at defendant's garage with a light meter. During her case in chief, plaintiff asked McNutt if he reached any conclusions based on his subsequent light readings. Defendant objected to this question because it required McNutt to testify to matters on which he testified in his deposition that he had no information. The trial court sustained the objection. Plaintiff thereafter called McNutt to testify on rebuttal and asked him whether he had made light measurements in the area. Defendant objected on the grounds that McNutt had testified in his deposition that he had not taken light readings and that this was not proper rebuttal testimony.

■ A trial court is vested with broad discretion in excluding or admitting evidence which has not been disclosed in response to appropriate discovery. *Green v. Fleishman,* 882 S.W.2d 219, 222 (Mo.App.1994). A trial court can exclude such evidence or impose other appropriate sanctions. *Id.* When an expert witness has been deposed and later bases his or her opinion on new or different facts, " 'it is the duty of the party intending to use the expert witness to disclose that new information to his adversary, thereby updating the responses made in the deposition.' " *Green,* 882 S.W.2d at 221–22, quoting *Gassen v. Woy,* 785 S.W.2d 601, 604 (Mo.App.1990). *See also State ex rel. State Hwy. Com'n v. Pfitzinger,* 569 S.W.2d 335, 336 (Mo.App. 1978). The admissibility of rebuttal evidence

is also within the trial court's discretion. *Nash v. Stanley Magic Door, Inc.*, 863 S.W.2d 677, 682 (Mo.App.1993).

Plaintiff argues that McNutt's testimony rebutted Millenbruck's testimony about the light levels in the area where plaintiff fell. A party is entitled to introduce evidence to rebut that of his adversary, and for this purpose any competent evidence to explain, repel, counteract, or disprove the adversary's proof is admissible. *St. Louis Southwestern v. Federal Compress*, 803 S.W.2d 40, 45 (Mo.App.1990). However, a party cannot, as a matter of right, offer in rebuttal evidence which was appropriate or should have been proffered in the case in chief, even if it tends to contradict or rebut the adverse party's evidence. *Nash*, 863 S.W.2d at 682, citing *Bean v. Riddle*, 423 S.W.2d 709, 719 (Mo. banc 1968).

McNutt's testimony contained in his offer of proof was that he took the light level reading with a light meter in the area where plaintiff fell, that his readings showed an average of less than one foot candle, and that the lighting in the area was inadequate. McNutt's proposed testimony was central to plaintiff's case and constituted testimony which should have been offered in her case in chief, had it been properly disclosed. The trial court did not abuse its discretion in refusing to admit McNutt's light meter testimony as rebuttal evidence. Point two is denied.

For her third point plaintiff asserts that "it was plain error for [defendant] to argue in closing argument that [it] maintained liability insurance on the Arch Parking Garage, because the mention of insurance or the financial condition of [defendant] is irrelevant, immaterial and prejudicial." We disagree.

At the outset we note that this point is insufficient to preserve an error for review. Points relied on must set out the actions or rulings of the trial court on which review is sought. Rule 84.04(d). This point does not assign error to any action taken by the trial court. Further, plaintiff did not object to this argument at trial and therefore did not preserve any error with respect to closing argument for review. *Krenski v. Aubuchon*, 841 S.W.2d 721, 728 (Mo.App.1992). We will,

however, exercise our discretion to review this plain error claim on the merits and read this point as a contention that the trial court plainly erred in not intervening in some manner.

Plaintiff called Jennifer Nixon, Bi-State's director of business development as her witness. In response to the question whether Bi-State could approve a warning sign if suggested by a National Park Safety Committee, she testified, "After checking with my insurance company, to get their input, the answer would be, yes, we could approve the sign." During closing argument, Bi-State referred to its liability insurance as follows:

But what else are they asking you? They're saying when Mrs. Bray pulled in the Bi-State garage on Memorial Day 1990, we are her health insurance company, we are her life insurance company, and we get to pay her what she would have earned for the rest of the life she may or may not have. We are a guardian angel and we pay her forever.

Yes, ladies and gentlemen, we did have insurance. Now, when I was trained, I was trained if anybody mutters the word insurance, get on your feet, scream, yell mistrial, mistrial. Don't let that jury know there's insurance, because once they know there's insurance, they will say, they have insurance, let them pay.

Well, ladies and gentlemen, I didn't, I didn't ask for a mistrial because I don't believe that's what you all are going to say. I don't believe you're going to say that just because Bi-State was responsible and had insurance for people who they might, through their own fault or negligence, injure, that therefore any time anybody falls or anybody who comes in the garage and stubs their toe and later had to have their knee amputated from diabetes, they have insurance, let them pay for it.

I believed you when you said you could be fair. You would be fair. That's all we're asking. Just be fair.

Yep, we're a quasi-governmental agency. Yes, we have insurance. Yes, we stand responsible to pay those people who we injure through our fault. But we're not here to pay for every bad thing that hap-

pens to every person who comes into the Arch garage. People who don't even look out for themselves.

Plaintiff did not object to Bi–State's comment that it had insurance or request relief therefrom.

In this case the defendant injected into the trial the issue of its own insurance. Defense attorneys may advise the jury that they are in fact representing a liability insurance carrier, "if they desire to incur the risk thereby involved." *Mavrakos v. Mavrakos Candy Co.*, 359 Mo. 649, 223 S.W.2d 383, 387 (1949). In *Mavrakos*, the Missouri Supreme Court observed that the fact that a jury is more likely to render a verdict against a defendant, and for a larger amount, if it knows the defendant has been protected by insurance, has been judicially noticed. *Id.* While the fact of insurance may prejudice a defendant, a defendant may voluntarily take that risk. *Id.; see also Lawson v. Cooper*, 475 S.W.2d 442, 447 (Mo.App.1972).

Plaintiff was not prejudiced by defendant's reference to its liability insurance. There was no error, plain or otherwise. Point three is denied.

The judgment of the trial court is affirmed.

GERALD M. SMITH and PUDLOWSKI, JJ., concur.