106 P.3d 277 (2005)
125 Wash.App. 773
STATE of Washington, Respondent,
v.
Michael L. SIPIN, Appellant.
No. 51647-7-I.
Court of Appeals of Washington, Division 1.
February 14, 2005.
*278 John R. Muenster, Muenster & Koenig, Seattle, WA, for Appellant.
Dennis McCurdy, King County Prosecutor's Office, Seattle, WA, for Respondent.
KENNEDY, J.
Michael Lee Sipin and his friend David Taylor were riding in Sipin's new BMW Z-3 convertible when it crashed and Taylor was killed. The State charged Sipin with vehicular homicide and, at trial, sought to admit computer-generated simulation evidence using Version 6.2 of a program called PC-CRASH to prove that Sipin had been the driver of the Z-3. Following a Frye[1] hearing, the trial court admitted the evidence, and the *279 jury convicted Sipin. We reverse and remand for a new trial. PC CRASH had not been validated for the purpose for which the evidence was offered  simulation and prediction of multiple-occupant movement within a vehicle during a multiple-collision accident. Moreover, scientific consensus had not been achieved among accident reconstructionists that PC-CRASH is even capable of accurately performing the predictions to which the State's expert witness testified. Accordingly, the evidence could not pass the Frye test, and the trial court erred by admitting it. Contrary to the State's assertion, a Frye hearing was necessary in this case and the error was not harmless.

FACTS
On March 6, 2000, Michael Sipin and David Taylor spent the afternoon together drinking beer, eating, and talking at Sipin's home in Maple Valley. Sipin owned a new, manual transmission BMW Z-3 convertible with a removable hardtop, and he bragged about the car to Taylor. Sipin subsequently testified that he occasionally had attacks of gout that prevented him from driving a car with a manual transmission. Sipin stated that he had gout on the day in question, was walking with a cane, and could not drive the Z-3, so his daughter had been using the car that day. Sipin's wife also testified that Sipin had gout on the day in question, could barely walk, and could not drive the Z-3. Paula Luedke, a physician's assistant who had treated Sipin for many years, confirmed that Sipin suffered from chronic gout, which made it painful for him to walk.
When Sipin's daughter arrived home with the Z-3, Taylor wanted to drive it, and Sipin testified that he agreed. Sipin also testified that Taylor had to adjust the driver's seat as far back as it would go, and had trouble locating reverse, but that eventually Taylor was able to drive the vehicle out of the driveway. Sipin's daughter testified that Taylor and Sipin left in the vehicle, with Taylor driving, shortly after 5 p.m. Sipin's wife testified that she saw Taylor in the driver's seat, and observed that he had some difficulty putting the car into reverse, but that she did not see who was driving when the car left the driveway.
Sipin testified that the roads around his home were "back country" roads with lots of hills and a 35 mph speed limit. Sipin stated that the roads were not safe to drive at high speeds. Sipin stated that he had planned to have Taylor drive along a scenic, hilly 15-minute loop leading back to the house. Sipin remembered Taylor turning onto the proper road, but testified that he did not remember the accident itself.
Soon after Taylor and Sipin left Sipin's home in the Z-3, three neighbors saw the car traveling at a high rate of speed on the rural road near Sipin's home. They did not see who was driving. Soon after the vehicle passed from their sight, they heard a "screech" and a loud crash. The neighbors called 911  at 5:11 p.m.  and then ran to the scene. They observed that the Z-3 had hit a mailbox on a metal pole that had been cemented into the ground with a large amount of concrete, ripping the mailbox and lifting the cement  which one witness said looked like it weighed several hundred pounds  out of the ground. After hitting the mailbox, the Z-3 hit a large tree. The State's accident reconstructionists testified that the vehicle hit the tree rear-first, forcing the passenger-side door forward into the right front quarter panel, and leaving the passenger seat open to the tree.
The witnesses found the Z-3's hardtop lying away from the vehicle. Both Taylor and Sipin had been ejected from the car. Taylor was found on the ground between the passenger-side door and the tree, with one foot in the car. Sipin was found about 10 to 15 feet behind the vehicle. The passenger-side airbag had been deployed. The gearshift was found on the right side of the car near the tree. None of the neighbors moved the men, the car, or the mailbox, but waited until emergency personnel arrived.
Taylor sustained serious injuries, and died soon after the accident. Sipin suffered permanent brain damage. He later stipulated that his blood alcohol level had been .11 two hours after the crash.
*280 Sipin was charged with one count of vehicular homicide, as the driver, under RCW 46.61.520(1)(a).

Frye Hearing
Sipin filed a motion to exclude the State's accident-reconstruction evidence that had been generated by use of a computer program called PC-CRASH, as well as the accompanying testimony by Ronald D. Heusser, the State's PC-CRASH expert witness. This evidence was offered by the State to prove that Sipin had been the driver of the Z-3 at the time of the crash. Sipin asserted that the computer-generated evidence was not admissible under the Frye test for admissibility of novel scientific evidence. A Frye hearing was held to determine the admissibility of the computer-generated evidence. Heusser, an engineer and accident reconstructionist, testified at the Frye hearing regarding his use of the computer program PC-CRASH to simulate the movement of the occupants in the accident.
Heusser testified that PC-CRASH is a simulation program, rather than an animation program. Heusser stated that "inputting" variables from the scene and the vehicle, such as steering, braking, and speed, would create a predictive image of the vehicle movement, based on the laws of physics. Heusser stated that he had previously testified at trials regarding the use of PC-CRASH for simulation of accidents involving single vehicles over rough terrain, multiple-vehicle accidents, and accidents involving vehicles and pedestrians. He testified that none of these cases had been appealed.
Heusser provided two studies, one from 1996, and another from 1999, for purposes of the Frye hearing.[2] The 1996 study, "Validation of PC-CRASH  A Momentum-Based Accident Reconstruction Program," showed a comparison between staged collisions of vehicles that measured tire marks, speed, and direction, and PC-CRASH simulations, and found that the computer simulations predicated speeds in car crashes that were in agreement with "real world" results. The 1999 study, "The Pedestrian Model in PC-CRASH  The Introduction of a Multi Body System and its Validation," was the first study of the use of a very simplistic human model in an updated version of PC-CRASH that provided a "multi-body" option for purposes of simulating the interaction between a pedestrian and the outside of a vehicle.
Heusser provided no validation studies that had been done on the use of the multi-body option of PC-CRASH to simulate the movement of a human body within the interior of a vehicle during a car accident. However, Heusser asserted that the principles used to predict interaction between a human body and the outside of a vehicle were the same as the principles used to predict interaction between a human body and the inside of the vehicle. Heusser used the multi-body option of Version 6.2 of PC-CRASH. Heusser testified that he was not aware of any significant debate in the accident-reconstruction community about the reliability of PC-CRASH for showing interior-occupant movement.
Heusser stated that to reconstruct the accident in the present case, he viewed King County survey data, a map and measurements of the scene, diagrams, the vehicle, digital photographs of the tire tracks, and friction tests on various surfaces involved in the accident. Heusser testified that he spent a lot of time "inputting" various speeds and turns until the PC-CRASH simulation followed the tire tracks documented by police at the scene. Heusser stated that he then entered the weight and body type of each occupant into the computer program to determine interior occupant movement. He asserted that these calculations had been validated by a Society of Automotive Engineers paper, but did not identify the study.
Even though the undercarriage of the vehicle was torn out by the impact with the mailbox, Heusser stated that he instructed the program to ignore the mailbox post after it was first hit because, in his opinion, it did *281 not affect the dynamics of the vehicle. Although Heusser never received information about the size and weight of the mailbox post and the concrete in which it was imbedded, he stated that the lack of such measurements made no difference to his calculations. Heusser also testified that the fact that the passenger-side airbag deployed, or that the gearshift was found outside on the passenger side of the vehicle, was not important in his overall calculation of forces of impact and momentum on the interior occupants.
Heusser illustrated his findings with a video of the PC-CRASH simulation. Heusser concluded, based on the data that he put into the PC-CRASH program, that the driver remained in his seat until the car hit the tree, and that the passenger was thrown out of the vehicle into the tree. Heusser opined that the vehicle's hardtop did not come loose until the car hit the tree, and that the occupants were ejected at that time.
Sipin presented no witnesses at the Frye hearing and presented no literature. However, Sipin objected throughout the hearing that the foundation for Heusser's conclusions was inadequate because PC-CRASH had neither been peer-validated for use as a simulation to predict interior-occupant movement during a multi-collision accident, nor admitted as evidence for such a purpose in Washington courts. The trial court overruled these objections. Nevertheless, during cross-examination Heusser admitted that none of the prior cases in which he used PC-CRASH to simulate vehicle accidents involved interior occupant movement simulations. Heusser also admitted that the 1996 study showed that the results of PC-CRASH were not always entirely accurate, and that no studies currently existed that validated PC-CRASH for use in simulating the interaction between a person and the interior surfaces of a vehicle during an accident. But he reasserted that the principles involving the exterior of a vehicle and a person were applicable to interior vehicle simulations.
Heusser also admitted that the 1999 study, which involved the use of PC-CRASH for simulation of pedestrian/vehicle accidents, did not indicate that the program could be used to predict interior-occupant movement, and that the study additionally concluded that further validation tests would be required to prove the results of the illustrated simulations. Heusser stated that such validation studies were undertaken in 2000. The State failed to provide the studies, but Heusser testified that the paper regarding the studies focused on validation of multi-body/person interaction with vehicle exterior surfaces, not interior surfaces.
The trial court ultimately allowed Heusser to testify as an expert witness at trial, and ruled that he could rely on the results of his PC-CRASH simulation as the basis for his expert opinion. The court held that "a sufficient showing has been made that the PC-Crash data is the type of data reasonably relied upon by experts in the accident reconstruction field in forming opinions or inferences upon the subject." 2 Report of Proceedings at 173. The court also stated that although an actual model for occupant movement within the vehicle was not presented, the mathematical principles that would support that model were illustrated by the studies validating simulations involving pedestrians and the exteriors of vehicles, and noted that the testimony regarding this issue was unrebutted and unimpeached. The court also found that the video and photo stills prepared by Heusser would assist the jury in understanding Heusser's testimony, and admitted them. However, the court limited the admission of the video and still clips for illustrative purposes only; it did not allow the jury to take the video back to the jury room.

Trial Testimony and Evidence
Heusser testified extensively at trial. Heusser described PC-CRASH to the jury as "a computer simulation program that enables us to look at vehicle occupant motion, vehicle crashes without the expense of crashing cars together or endangering occupants." 5 Report of Proceedings at 31. Heusser further described a "simulation" as a predictive type of computer program that obeyed the laws of physics, and told the jury that the software in PC-CRASH was limited by the laws of physics. He informed the *282 jury that the program had been validated by a "fair number" of six papers published by the Society of Automotive Engineers, and that the validation studies had shown that PC-CRASH had relied on known data from actual test crashes to formulate its simulations. Heusser asserted that PC-CRASH was valid to show occupant movement within a vehicle, and that the program was generally relied upon in the accident reconstruction field.
Heusser stated that he had used PC-CRASH in the present situation to model occupant movement. He testified that he used three-dimensional scene survey measurements obtained from King County detectives, photographs, and a personal examination of the vehicle and the road, to create the simulation. Heusser stated he put data into PC-CRASH, and then tried varying speeds and directions until the simulated vehicle's movement and impacts matched the actual tire marks at the scene and the damage to the actual vehicle.
Heusser then presented the PC-CRASH computer simulation and snapshots. The video simulation was shown several times, both in actual speed and slow motion. Heusser testified that the simulation illustrated that the occupants remained in their positions in the vehicle after impact with the mailbox, and until the vehicle hit the tree. Heusser opined that the hardtop came loose when the car hit the tree and the occupants were ejected. Heusser stated that the simulation showed that the passenger was thrown into the tree and that the driver was thrown behind the vehicle. Thus, Heusser concluded that Taylor was the passenger and Sipin the driver.
Heusser was cross-examined extensively on the vehicle's impact with the mailbox imbedded in concrete, and the damage to the undercarriage of the vehicle, and maintained that this impact was not significant to the movement of the occupants.
Detective David Wells, a certified expert in accident reconstruction with the King County Sheriff's office, testified that he was paged to go to the scene of the accident about half an hour after the first 911 call was received. Detective Wells stated that he made the initial report of the scene, recording weather quality, marking tire tracks and gouges to the roadway, and measuring damage to the vehicle and fixed objects. He stated that he used a measuring system called a total station instrument, which utilizes infrared beams from a tripod to record two-dimensional measurements of the collision scene and produce a scale diagram of the entire roadway, physical objects, and tire marks. Detective Wells stated that based on his calculations, he could determine the direction the vehicle took and the speed of the vehicle at impact with various objects.
Although Detective Wells did not do calculations to determine occupant movement during the accident, he stated that his preliminary opinion at the scene was that the person lying between the passenger door and the tree was the passenger. He also stated that the mailbox pole and concrete were dragged 11 feet from where the mailbox was originally located. Detective Wells stated that although the mailbox post and cement base were too bulky to collect, he could estimate the force of the crush impact without taking the mailbox into evidence. However, he admitted that he did not do any crush testing of the car or make any specific measurements of the indentation caused by the collision with the mailbox pole. The day after the accident, when Detective Wells returned to take pictures and aerial shots of the scene, the mailbox owner had used his tractor to remove the mailbox.
A forensic scientist with the Washington State Patrol Crime Laboratory was unable to locate any biological stains within the vehicle's interior to match to either occupant, but recovered dark blue fibers from the airbag on the passenger side of the vehicle and on the passenger-side door panel. Another forensic scientist found that these fibers matched the fiber of the jeans worn by Taylor. He also found melted plastic on the right side of Taylor's jeans that was consistent with the plastic used in the door panels. The scientist was not able to find evidence that the jeans or black jacket worn by Sipin came into contact with the passenger-side airbag.
*283 An expert witness in latent-fingerprint analysis from the King County Sheriff's office could not identify any latent fingerprints on the Z-3's gearshift knob, parking-brake handle, headlight switch, steering wheel, or any other areas of the interior of the vehicle. A Washington State crime laboratory analyst who was an expert in matching shoe prints was not able to match prints on the boots worn by either Sipin or Taylor to the pedals of the Z-3 or to the rubber floor mats.
The medical evidence showed that Sipin suffered permanent brain damage, as well as perforations to his intestines, from blunt-force trauma to his abdomen. The medical evidence also showed that Taylor sustained serious injuries, primarily to the right side of his body.[3]
Mr. Kay Sweeney, a forensic scientist, viewed the vehicle and various exhibits, and testified for Sipin. Sweeney testified that he had previously worked for the King County Sheriff's Department as the director of the crime lab, and for the Seattle Police Department, and that he had been involved in over 500 crime-scene reconstructions. Sweeney used the same aerial shots, photographs, skid mark measurements, and survey evidence prepared by Detective Wells. Sweeney also examined the jeans worn by Sipin, and testified that he found smears of plastic on the right lower side of the jeans, consistent with the tan plastic from the door panels. Sweeney also stated that he found evidence that indicated that the black jacket worn by Sipin came into contact with the passenger airbag and left a seamed transfer pattern. Sweeney stated that the method of the transfer was consistent with deployment of the airbag.
Sweeney examined the jeans worn by Taylor, and found tears and melted plastic on them that he believed were made through interaction of the jeans with the interior of the vehicle. Sweeney testified that the dash above the glove box, the right-side airbag, and the right door panel and armrest had smear patterns that matched the jeans. Sweeney opined that the smears on the glove box, dashboard, and doorframe indicated horizontal movement from the driver's side toward the passenger's side and out the passenger-side door. Sweeney concluded, based on the pattern on the airbag, the fibers on the airbag, and Taylor's jeans, that Taylor's jeans had smeared across the airbag and abraded a hole into it after it deployed and deflated and lay on the doorframe. Sweeney also found fibers consistent with Taylor's jeans on the driver's console strip, near the boot of the gearshift.
Sweeney further testified that in his opinion, the State's witnesses had underestimated the impact between the Z-3 and the mailbox imbedded in cement. Sweeney opined that the extensive damage to the right wheel on the Z-3  a gouge that cut the tire in a half moon shape through the sidewall and bent the wheel assembly under the vehicle  was caused by the chunk of imbedded cement, and not by the collision with the tree. Sweeney noted that the vehicle had significant undercarriage and rear-end damage, and asserted that the concrete post and attached metal pole had likely caused the damage. Sweeney also opined that based on the extreme damage to the passenger side of the Z-3 from the impact with the tree, which bent the seat forward and forced it under the console, a person who remained in the passenger seat until the car hit the tree could not have been ejected directly from the passenger seat out the passenger-side door, but would instead have been pinned inside the car.
Based on all the evidence, Sweeney concluded that Sipin was sitting in the passenger seat when the airbag deployed, and that the airbag deployed when the vehicle hit the mailbox and dragged the cement ball out of the ground. Sweeney opined that the Z-3 rode up on the mailbox pole and was briefly launched, as shown by a gap in the skid marks, and that Sipin was projected into the *284 roofline, whereas Taylor was restrained by the steering wheel. Sweeney opined that when the Z-3 landed, it collided with and wrapped around the tree, at which point Sipin was ejected out of the passenger's seat and through the by-then opened roof, just before Taylor was thrown low from the driver's seat and out the passenger door.
When the prosecutor cross-examined Sweeney on his conclusion that the Z-3 was launched into the air by the collision with the mailbox, Sweeney reasserted that the vehicle was airborne for at least part of the time before it collided with the tree and came to a final rest, and that Sipin was projected into the roofline until ejected from the car. Sweeney also emphasized that he could have calculated the force of the mailbox and cement ball more accurately if they had been preserved as evidence.
During closing argument to the jury, the prosecutor described PC-CRASH as a computer program that
essentially takes the laws of physics and reduces them to mathematical calculations that can be done over and over again to generate an accurate picture of what happened during a collision based on the tire marks at the scene, based on the physical evidence in the case such as the damage to the car, as well as the conditions that can be observed at the scene.
13 Report of Proceedings at 13. The prosecutor then showed the PC-CRASH video to the jury, again.
Sipin was convicted as charged.

Sipin's Motions for a New Trial
After his conviction, Sipin filed a motion for a new trial in which he again argued that PC-CRASH had not been validated for the use exercised by Heusser in reconstructing the accident. Sipin also asserted that Heusser manipulated data by entering arbitrary "inputs" such as separation speeds as high as 1,114.8 mph, placing the mailbox pole away from where it was actually located, and having the computer occupant models remain in a default resting position after the collision with the mailbox.
Sipin's motion was supported by the declaration of Brian McHenry, an expert in accident reconstruction. McHenry had been involved in the creation of mathematical models and computer programs for simulations of vehicle collisions including CAL-2D, HVOSM, SMAC, and CRASH, which were the bases for most existing vehicle dynamics and accident reconstruction programs. McHenry stated that he was fully familiar with PC-CRASH and its abilities and limitations. McHenry stated that Heusser did not include detailed vehicle interior measurements, that he improperly placed the models in the computer programs at a "default" seated setting after the impact with the mailbox, and that he "inputted" arbitrary speed changes at the mailbox and tree that were not determined or calculated by the program. These included speeds ranging from 1,114.8 mph down to 88.6 mph and back to 127.2 mph, within a second and a half.
McHenry stated that the validity of PC-CRASH results was based on real world tests, and that the program should not be used as the sole basis for accident reconstruction conclusions. He further asserted that the multi-body version used by Heusser had not been validated to simulate or predict the movement of interior occupants, and that no computer model currently existed that had been validated as a predictive model for detailed occupant kinematics.
Sipin also submitted three studies that he believed undermined the validity of Heusser's use of the multi-body option in PC-CRASH as a predictive model for occupant movement in car crashes.[4] A 1999 paper, "A New Approach to Occupant Simulation Through the Coupling of PC-Crash and MADYMO," studied the evolving science of vehicle-occupant movement through the joined use of two computer programs. This study *285 used PC-CRASH solely for predicting vehicle movements and "inputted" results of those simulations into MADYMO (MAthematical DYnamic MOdel), a computer program that was validated to simulate occupant movement. The study did not use the multi-body option in PC-CRASH. It also emphasized that the modeling dummy used to illustrate occupants was validated only for frontal collisions and not for multiple impacts, and was to be used solely for the purpose of evaluating different restraint systems.
A 2002 paper, "Methods of Occupant Kinematics Analysis in Automobile Crashes," analyzed various bases for evaluating free body motion within a vehicle, including plotting of vehicle motion to determine occupant motion. The examples utilizing PC-CRASH in the paper were simplistic, based on movement of one vehicle, and did not validate PC-CRASH to predict multiple-occupant movement in a multi-collision situation where the occupants are ejected from the vehicle. Another 2002 paper, "Occupant Kinematics in Forensics: Evaluating the Appropriateness and Applicability of an ATB Application," was authored by McHenry and described the development of the Articulated Total Body (ATB) model computer program, which is used to simulate the dynamic motion of jointed systems of rigid bodies. This paper emphasized that although ATB was the most evolved model for vehicle occupants, it modeled a simple passive dummy occupant and had "never been validated as a general predictive occupant kinematics simulation model for any type of real-world accidents." Clerk's Papers at 162.
The trial court denied Sipin's motion for a new trial, noting that the information provided by Sipin had been available when he made his first motion to exclude the evidence, prior to trial. The judge also stated that he was not certain that he would have rejected Heusser as an expert witness on the basis of McHenry's opinions.
Sipin renewed the motion, attaching an assessment of Heusser's PC-CRASH simulation from Boyd Allin of MacInnis Engineering Associates, Inc., which is the distributor of PC-CRASH for North America. Similar to McHenry, Allin opined that Heusser's arbitrary "inputs" made the results of the occupant modeling highly suspect. Allin also stated that the PC-CRASH program could not calculate the speed change of a vehicle when it strikes a pole and pulls it out of the ground, and that Heusser should have considered this problem in his calculations. Finally, Allin emphasized that the multi-body model PC-CRASH program had not been validated for use in modeling the interaction of occupants within the vehicle interior, and that Heusser's use represented "an overextension of the capabilities of the model." Clerk's Papers at 310.
The court denied Sipin's renewed motion, finding it to be a collateral attack on the previous order denying the first motion for a new trial, and that the evidence was of the same type offered at the first motion.
Sipin appeals the admission of the car crash simulation evidence generated by PC-CRASH and the accompanying testimony of Heusser, together with the trial court's denial of his motions for a new trial.

DISCUSSION
In Washington, the Frye test is used to determine the admissibility of novel scientific evidence. State v. Copeland, 130 Wash.2d 244, 261, 922 P.2d 1304 (1996) (citing Frye v. United States, 293 F. 1013, 34 A.L.R. 145 (App.D.C.1923)). While this court generally reviews the trial courts decision on a motion for a new trial for abuse of discretion, Palmer v. Jensen, 132 Wash.2d 193, 197, 937 P.2d 597 (1997), review of admissibility of evidence under the Frye test is de novo. Copeland, 130 Wash.2d at 255, 922 P.2d 1304. Moreover, we are not limited to the evidence that was before the trial court with respect to the Frye admissibility issues, and may undertake a searching review of scientific literature as well as secondary legal authority before rendering a decision. Id. at 256, 922 P.2d 1304. A key reason for this expanded scope of appellate review is that "it is impractical in many instances for a true cross-section of scientists to testify at a hearing." Id. (citations omitted). We may not properly sustain a trial court's determination regarding admissibility on a mere finding *286 that the record contains sufficient evidence of the reliability of the challenged scientific method. State v. Cauthron, 120 Wash.2d 879, 887, 846 P.2d 502 (1993).
Under the Frye test, scientific evidence is admissible if it is generally accepted in the relevant scientific community, but not admissible if there is a significant dispute among qualified experts as to its validity. Copeland, 130 Wash.2d at 255, 922 P.2d 1304. Under Frye, novel scientific evidence is admissible where (1) the scientific theory or principle upon which the evidence is based has gained general acceptance in the relevant scientific community of which it is a part; and (2) there are generally accepted methods of applying the theory or principle in a manner capable of producing reliable results. State v. Riker, 123 Wash.2d 351, 359, 869 P.2d 43 (1994).
The reliability of evidence derived from scientific methods depends upon three factors: "(1) the validity of the underlying principle, (2) the validity of the technique applying that principle, and (3) the proper application of the technique on a particular occasion." (Footnotes omitted). Gianelli, The Admissibility of Novel Scientific Evidence: Frye v. United States, a Half-Century Later, 80 Colum. L.Rev. 1197, 1201 (1980). The first two factors are critical with regard to the admissibility of evidence derived from a novel scientific technique.
State v. Huynh, 49 Wash.App. 192, 195, 742 P.2d 160 (1987).
However, if the proffered evidence does not involve new methods of proof or new scientific principles, then the Frye inquiry is not necessary. State v. Ortiz, 119 Wash.2d 294, 311, 831 P.2d 1060 (1992). This is because full acceptance of a process in the relevant scientific community obviates the need for a Frye hearing. State v. Russell, 125 Wash.2d 24, 41, 882 P.2d 747 (1994).
The State argues that no Frye hearing was necessary in this case because the laws of physics are well known, and all that Heusser did was to use PC-CRASH to apply mathematical equations and the laws of physics  as accident reconstructionists have always done  utilizing a computer program rather than a slide rule and a pocket calculator. We agree with the trial court that a Frye hearing was necessary. Jurisdictions that have addressed the issue uniformly hold that the admissibility of computer-generated models or simulations (as opposed to animations) as substantive proof or as the basis for expert testimony regarding matters of substantive proof is conditioned upon a sufficient showing that (1) the computer is functioning properly; (2) the input and underlying equations are sufficiently complete and accurate (and disclosed to the opposing party so that they can be challenged); and (3) the program is generally accepted by the appropriate community of scientists for use in the particular situation at hand. See Commercial Union Ins. Co. v. Boston Edison Co., 412 Mass. 545, 549, 591 N.E.2d 165 (1992); Commonwealth v. Fatalo, 346 Mass. 266, 269, 191 N.E.2d 479 (1963); Bray v. Bi-State Dev. Corp., 949 S.W.2d 93, 98 (Mo.App.1997); Kudlacek v. Fiat S.p.A., 244 Neb. 822, 509 N.W.2d 603, 617 (1994); State v. Clark, 101 Ohio App.3d 389, 655 N.E.2d 795, 812 (1995). Contrast Commonwealth v. Serge, 58 Pa. D. & C.4th 52 (2001) (distinguishing between computer-generated animations and computer-generated simulations, in terms of tests for admissibility). We agree with these courts, and hold that in Washington, computer-generated simulations used as substantive evidence or as the basis for expert testimony regarding matters of substantive proof must have been generated from computer programs that are generally accepted by the appropriate community of scientists to be valid for the purposes at issue in the case.

Our Independent Review
This court requested that the State provide the PC-CRASH manual for version 6.2, the version used by Heusser. We appreciate that the State provided both the Technical Manual and the Users Manual for PC-CRASH version 6.2. We have examined these manuals to determine whether the program parameters include the uses described by Heusser at trial, that is, the prediction of movement of two occupants of a vehicle in a multi-collision accident. They do not.
*287 The Technical Manual primarily describes the mathematics involved in the computer program. This manual briefly describes the multi-body model, the model that Heusser used to make his simulation. While the manual states that this model may be used "to correlate pedestrian and occupant injuries to vehicle damage areas," the primary focus of this section of the manual is the use of the model for purposes of pedestrian/vehicle impacts. (Tech. Man. at 51-62).
The User Manual for version 6.2 of PC-CRASH expands the description of the multi-body model and additionally states that a multi-body occupant option "allows impacts to be automatically calculated between the occupant's multibody components and the vehicle's interior or other occupant multibodies." However, the User Manual warns that speeds over 25 mph "can cause the multibody shape to go through the vehicle outline and then rebound unrealistically due to a force much higher than could normally occur." The manual states that the position of the model within the vehicle can be modified, but provides no options for different types of seats, or for height or weight of the model. (User Man. at 57, 223). This is directly contrary to Heusser's assertions, during the Frye hearing, that he was able to input the height and weight of Sipin and Taylor.
The User Manual also does not provide information on modeling interaction between the occupant and interior components, airbags, or removable convertible hardtops. The User Manual describes using a 3D drafting program, AutoCAD, to create surfaces in a vehicle for purposes of calculating a contact point, but does not mention its use for modeling a removable convertible rooftop that flexes and comes off during a collision. And, while the User Manual provides information on how to change the default settings for a single impact to assist with simulation of secondary impacts for vehicles, the manual does not describe the use of the occupant model in a multiple or secondary impact situation like that at issue in the present case.
The User Manual states that the MADYMO (MAthematical DYnamic MOdel) is a more comprehensive multi-body occupant option, and that this additional option is provided in version 6.2 of PC-CRASH to carry out more detailed simulations of restrained or unrestrained occupant movement. The MADYMO model includes a seat with changeable parameters, a steering wheel, lap and torso seat belt options, and airbags. However, the User Manual cautions that only one MADYMO occupant can be modeled at a time and that the occupant cannot be out of a normal seated position at the start of the impact. The manual also warns that the occupant height is defaulted at 5' 9" tall and cannot be changed. The steering wheel geometry, foot well, and seat cushion dimensions are fixed. The manual does not describe whether or how the MADYMO model could be used in a multi-impact collision.
Thus, the PC-CRASH manuals describe several limitations on the use of both the occupant model and the MADYMO model to simulate occupant movement in a vehicle accident. Additionally, there is no mention in either manual of the use of the occupant model to predict complicated interior occupant movement in a multi-collision situation, taking into consideration vehicle interior components, multiple impacts, and a removable convertible hardtop. While the MADYMO model is the most comprehensive occupant model available, it is not available for more than one occupant and was not used by Heusser in the present situation, in any event. Most importantly, neither manual indicates that either occupant model has been validated for use in accurately predicting or simulating occupant movement in multiple impact situations.
These limitations in the PC-CRASH program are reflected in the declarations and papers provided by Sipin in his motions for a new trial and indicate that, contrary to Heusser's assertions otherwise, the program is not generally accepted in the relevant scientific community to predict or simulate complicated interior-occupant movement in a multiple-collision accident, the purpose to which the software was put to produce evidence for trial in this case.
Brian McHenry, who had assisted in the creation of several car crash simulation programs and was fully familiar with the limitations of PC-CRASH, stated that the program *288 should not be used as the sole basis for accident reconstruction conclusions. McHenry asserted that the multi-body version used by Heusser had not been validated to simulate or predict the movement of interior occupants and that no computer model currently existed that had been validated as a predictive model for detailed occupant kinematics.
Boyd Allin of MacInnis Engineering Associates, Inc., the distributor of PC-CRASH for North America, emphasized that the multi-body model PC-CRASH program had not been validated for use in modeling the interaction of occupants within the vehicle interior, and that Heusser's use represented "an overextension of the capabilities of the model." Allin stated that the PC-CRASH program could not calculate the speed change of a vehicle when it strikes a pole and pulls it out of the ground, and that Heusser had nonetheless not considered this problem in his calculations.
The three papers submitted by Sipin post trial also showed the limitations of the PC-CRASH program. "A New Approach to Occupant Simulation Through the Coupling of PC-Crash and MADYMO," emphasized that the MADYMO modeling dummy, the most evolved occupant model available, was validated only for frontal collisions and was to be used solely for the purpose of evaluating different restraint systems. The PC-CRASH manual further illustrates that this advanced model has substantial limitations, including that only one occupant may be modeled at a time. "Methods of Occupant Kinematics Analysis in Automobile Crashes," did not validate PC-CRASH to predict multiple occupant movement in a multi-collision situation, including the interaction of interior components, or where the occupants are ejected from the vehicle. Finally, "Occupant Kinematics in Forensics," authored by McHenry, emphasized that the ATB model used for vehicle occupants in simulation programs had "never been validated as a general predictive occupant kinematics simulation model for any type of real-world accidents." Clerk's Papers at 162.
In sum, the two post-trial declarations provided by Sipin, the three papers that he submitted post trial, and the PC-CRASH manuals themselves illustrate that there is no general acceptance in the relevant scientific community of the use of this PC-CRASH program for the purposes to which it was put by Heusser. We have not been able to locate any documents that support the State's position, and the State has provided none.[5]
It is not our task to determine whether a scientific method or theory is correct. Such is beyond the expertise of courts. Instead, it is our task to determine whether the appropriate scientific community has generally reached consensus that the method or theory is reliable. Cauthron, 120 Wash.2d at 887, 846 P.2d 502. Even so, we are concerned that McHenry and Allin allege that in order to reach his conclusions, Heusser manipulated data, ignored the limitations of the program, and ignored the impact between the BMW and the mailbox imbedded in concrete. McHenry stated that Heusser did not include detailed vehicle interior measurements and *289 that he "inputted" arbitrary speed changes at the mailbox and tree that were not determined or calculated by the program. Apparently, these speeds ranged from 1,114.8 mph down to 88.6 mph and back to 127.2 mph within a second and a half  a mind-boggling proposition that seems to illustrate the potential danger of blind acceptance by the courts of unsubstantiated assurances by an expert witness that a particular computer program is reliable because it obeys the laws of physics.
Although much of the evidence provided by McHenry and Allin clearly goes to the weight to be accorded Heusser's testimony, much of it also relates to admissibility of the evidence under Frye, because it illustrates the limitations that two members of the relevant scientific community see in the computer program at issue  and explains why it is that the relevant group of scientists have not reached consensus that PC-CRASH is reliable for the uses that Heusser attempted to make of the program for purposes of this trial.
In sum, notwithstanding Sipin's failure to present expert testimony and supporting documentation that was available at the time of the Frye hearing, the State cannot properly rely upon evidence that is inadmissible under Frye in order to uphold Sipin's conviction on appeal. De novo appellate review sometimes requires that the court review scientific evidence that was not presented to the trial court even though it was available, as is the case here. A higher principle than the performance of Sipin's trial counsel is at stake.[6] Once an appellate court determines that the Frye test has been met as to a specific novel scientific theory, the trial courts generally may rely upon that ruling to govern admissibility of the same theory in subsequent cases. Cauthron, 120 Wash.2d at 888 n. 3, 846 P.2d 502. In light of our conclusion that the challenged evidence in this case was not admissible under Frye, we cannot countenance the State's use of such evidence here or in future cases  and that will remain true until such time as the relevant scientific community may reach consensus with respect to the validity and reliability of the PC-CRASH program used by Heusser, for the specific purposes here at issue.
After this case was argued, another division of this court addressed the admissibility of evidence generated by a PC-CRASH program, and affirmed the trial court's admission of the evidence under Frye. See State v. Phillips, 123 Wash.App. 761, 98 P.3d 838 (2004). There, the defendant in a vehicular homicide case admitted to driving the vehicle during the accident, in which his car ran off the road and hit a pole. At issue was whether the evidence generated by PC-CRASH could be admitted to discount the driver's version of events  that he had been driving at the speed limit while negotiating a curve, but swerved to miss a deer and lost control of the car. In Phillips, the PC-CRASH program was used to predict movement of the vehicle in a single-impact crash, and the relevant scientific community of accident reconstructionists agreed that the computer program was reliable for that purpose. Our decision on the admissibility of the proffered evidence is different because here the State sought to use PC-CRASH for a purpose that is strongly disputed by the relevant scientific community: use of the multi-body version of PC-CRASH to predict interior occupant movement in a multi-impact accident.

Harmless Error
The State argues that even if the evidence was erroneously admitted, the error was harmless. See State v. Leuluaialii, 118 Wash.App. 780, 77 P.3d 1192 (2003) (erroneous admission of canine DNA evidence despite failure of scientific process to meet Frye test required reversible error examination). Sipin must show "within reasonable probabilities" that but for the alleged error the outcome of his trial would have been different. State v. Smith, 106 Wash.2d 772, 780, 725 P.2d 951 (1986) (erroneous admission of defendant's prior burglaries in unrelated rape case required reversible error examination). As should be clear from the extensive statement of facts with which we commenced this opinion, the record compels the conclusion that the outcome of the trial *290 might reasonably have been different if the trial court had excluded the challenged evidence.
The primary issue at trial was the identity of the driver. The trial court ruled that Mr. Heusser could present the computer generated simulation video and pictures and also testify that the simulation accurately showed what happened during the incident. Heusser testified to that conclusion at trial, and he showed the video several times, both in full speed and in slow motion, stopping the video at various frames to illustrate the bases for his opinions. The State relied heavily on Heusser's testimony  and played the video again during closing argument. The remaining evidence of Sipin's guilt was more or less evenly split. Forensic scientists matched Taylor's jeans to fibers within the passenger compartment. However, Sweeney testified that these fibers indicated movement from the driver to passenger side of the vehicle and across a deflated airbag. He concluded that Taylor traveled across the vehicle interior when the BMW hit the tree. Sweeney also matched an imprint on the passenger airbag to Sipin's jacket and testified that the imprint occurred when the vehicle first hit the mailbox, thus showing that Sipin was the passenger.
Although Detective Wells stated that his preliminary opinion at the scene was that the person who was lying between the passenger door and the tree was the passenger, and the other occupant was the driver, he did not do calculations to determine occupant movement during the accident. He also did not measure the force of impact from the mailbox or preserve it as evidence. Sweeney testified that he could have more accurately calculated the force of the mailbox on the BMW if it had been properly preserved, but that it was a significant impact as indicated by the large amount of damage to the BMW, and was, therefore, significant to the accident reconstruction. Other prosecution evidence was inconclusive in determining which occupant was the driver. The medical evidence regarding Taylor's various injuries along the right side of his body was not linked by any expert witness other than Heusser to Taylor's potential location in the BMW. Significantly, several witnesses testified that Sipin suffered from gout and could not drive a manual transmission on the day in question. Sipin's wife testified that she saw Taylor in the driver's seat shortly before the two left. Sipin's daughter testified that Taylor was driving when the vehicle left the driveway, a little after 5 p.m. Witnesses testified that they saw the car traveling at a high rate of speed a few minutes later, and the first 911 call was received at 5:11 p.m.
We conclude that within reasonable probabilities, but for the error in admitting the computer-generated simulation evidence, the outcome of his trial might have been different.
Reversed and remanded for a new trial.
WE CONCUR: BECKER, and BAKER, JJ.
NOTES
[1] See Frye v. United States, 293 F. 1013, 34 A.L.R. 145 (App.D.C.1923).
[2] See Cliff, William E., and Montgomery, Darcy T., Validation of PC-CRASH  A Momentum-Based Accident Reconstruction Program, SEA International (1996) (Ex. 8); Moser, A., Steffan, H. and Kasanicky, G., The Pedestrian Model in PC-CRASH  The Introduction of a Multi Body System and its Validation, Society of Automotive Engineers (1999) (Ex. 9).
[3] Doctor Richard Harruff, the chief medical examiner for the King County Medial Examiner's Office, performed an autopsy on Taylor. Dr. Harruff noted that Taylor had several scrapes, primarily on the right side of his body  including the face, lower chest, arm, and leg. Dr. Harruff also noted that Taylor had rib fractures on both sides, a sternum fracture, a bruised heart and diaphragm, bruising on his head on the right side, and that the right lobe of his liver was extensively torn.
[4] See Steffan, H. and Geigl, B.C., A New Approach to Occupant Simulation Through the Coupling of PC-Crash and MADYMO, SAE International (1999); Bready, Jon E. et al., Methods of Occupant Kenematics Analysis in Automobile Crashes, SAE International (2002); McHenry, Brian G., Occupant Kinematics in Forensics: Evaluating the Appropriateness and Applicability of an ATB Application, ATB Users' Group Conference (2002).
[5] This court also reviewed various publications from the Society of Automotive Engineers (SAE). These include a study mentioned but not provided by Heusser during his Frye hearing testimony, which validates the PC-CRASH pedestrian model (SAE # XXXX-XX-XXXX), and a study validating the use of PC-CRASH/MADYMO coupling in 2000 (SAE # XXXX-XX-XXXX). SAE # XXXX-XX-XXXX makes no mention of occupant modeling or occupant movement in PC-CRASH. And, as pointed out in the discussion, Heusser did not use the MADYMO coupling but used the "multi-body" occupant option; thus SAE # XXXX-XX-XXXX is not relevant to our discussion here. Other SAE publications include a study on stability analysis within PC-CRASH which discusses the development/application of an algorithm that can be used to determine uncertainty ranges for each input parameter in PC-CRASH, but which does not mention occupant kinematics (SAE # XXXX-XX-XXXX); a paper addressing the validation of PC-CRASH/MADYMO program coupling for purposes of validating vehicle rollovers, which also does not discuss multiple occupant movement in multi-collision accidents (SAE # XXXX-XX-XXXX); a study on uncertainty values in accident reconstruction using PC-CRASH, which made no mention of occupant kinematics or modeling of interior occupant movement in PC-CRASH (SAE # XXXX-XX-XXXX); and a paper involving evidentiary considerations of computer generated exhibits that made no mention of PC-CRASH (SAE # XXXX-XX-XXXX). In sum, none of these articles supports a conclusion that PC-CRASH has ever been validated for the purpose for which it was used here.
[6] Sipin's current counsel on appeal is different from his trial counsel.